No. 2014-1084
(Reexamination Nos. 90/011,528 & 90/011,550)

_____

# United States Court of Appeals for the Federal Circuit

_____

IN RE: INDEX SYSTEMS, INC.

_____

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board

_____

**OPENING BRIEF OF APPELLANT INDEX SYSTEMS, INC.**

Laurence S. Rogers
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000

Megan F. Raymond
ROPES & GRAY LLP
700 12th St. NW
Washington, DC
Telephone: (202) 508-4600

*Attorneys for Appellant Index Systems, Inc.*

January 27, 2014

**U.S. Patent No. 6,701,523, claims 1 and 11 (A65):**

1. A system for restricting access to television programs comprising:

   an input for accepting cursor movement and selection commands;

   a display that depicts a two dimensional matrix composed of rows and columns of tiles, wherein either the rows of tiles or the columns of tiles correspond to overall program ratings and either the rows of tiles or the columns of tiles correspond to specific program content indications and depicts highlighting of individual tiles or groups of tiles based on the cursor movement commands; and

   means for blocking or allowing viewing of television programs based on the overall program ratings and specific content ratings of the rows and columns corresponding to the highlighted tiles when a selection command is entered into the input.

11. A method of restricting access to television programs comprising:

    inputting cursor movement and selection commands;

    displaying a two dimensional matrix composed of rows and columns of tiles, wherein either the rows of tiles or the columns of tiles correspond to overall program ratings and either the rows of tiles or the columns of tiles correspond to specific program content indications and depicts highlighting of individual tiles or groups of tiles based on the cursor movement commands; and

    blocking or allowing viewing of television programs based on the overall program ratings and specific content ratings of the rows and columns corresponding the highlighted tiles when a selection command is entered into the input.

## CERTIFICATE OF INTEREST

Counsel for respondent Index Systems, Inc., certify the following:

1.     The full name of every party or amicus represented by me is:  Index Systems, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  n/a.

3.     All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party or amicus represented by me are:  Rovi Guides, Inc., which, in turn, is 100% owned by Rovi Corporation (publicly held).

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the agency or are expected to appear in this court are:

<u>Ropes & Gray LLP</u>: Laurence S. Rogers, Richard M. Feustel, Megan F. Raymond, and Gall Gotfried, and technical advisors Karan Singh (admitted only to U.S. Patent and Trademark Office) and Laura Zager (admitted only to U.S. Patent and Trademark Office at time of participation, no longer at Ropes & Gray).

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

STATEMENT OF THE ISSUES............................................................................3

STATEMENT OF THE CASE...............................................................................4

STATEMENT OF FACTS .....................................................................................5

I.      THE '523 PATENT ....................................................................................5

        A.      The Patent's Disclosure.................................................................5

        B.      The Patent's Claims.......................................................................9

II.     THE PRIOR ART ......................................................................................10

        A.      Casement .....................................................................................10

        B.      EIA-744 .......................................................................................12

III.    THE REEXAMINATION .........................................................................16

IV.     THE BOARD'S DECISION ......................................................................21

        A.      Apparatus Claim 1 ......................................................................21

        B.      Claims 2-13 .................................................................................25

SUMMARY OF ARGUMENT ............................................................................26

ARGUMENT .......................................................................................................29

I.      LEGAL STANDARDS .............................................................................29

II.     THE BOARD'S OBVIOUSNESS DETERMINATION WAS
        BASED ON ERRORS OF LAW AND NO SUBSTANTIAL
        EVIDENCE ...............................................................................................30

        A.      The Board Erred As A Matter Of Law By Misconstruing
                The Claims To Be Not Directed To A User Interface ......................31

                1.      The Claims Define A User Interface .................................31

                2.      The Patent Describes The Invention As A "User
                        Interface"........................................................................35

3.      The Examiner Understood The Claims Define A User Interface ......................................................................36

4.      Index Systems Had No Opportunity To Respond To The Board's New Claim Construction.......................................38

B.      The Board Erred As A Matter Of Law By Failing To Consider Whether EIA-744 Is Analogous Prior Art ...........................39

1.      EIA-744 Concerns A Different Field Of Endeavor .................41

2.      EIA-744 Would Not Have Logically Commended Itself...........................................................................43

3.      The Board Did Not Consider The Analogous Art Issues ...........................................................................44

C.      The Board Erred In Determining The Level Of Ordinary Skill In The Art................................................................45

1.      The Level Of Ordinary Skill Asserted By ...............46

Index Systems And Accepted By The Examiner................................46

2.      No Substantial Evidence Supports The Board's Finding Of The Level Of Ordinary Skill ...................................49

3.      The Board's Flawed Level Of Ordinary Skill Mandates Reversal ..................................................51

D.      Even If EIA-744 Is Analogous Prior Art, The Claims Are Not Obvious ...........................................................52

1.      The Claimed Invention Was Not Obvious To Try ..................53

2.      Casement Discourages The Invention Under The Correct Construction And Level Of Ordinary Skill .................56

3.      EIA-744 Taught Away Under The Correct Construction And Level Of Ordinary Skill...............................58

4.      EIA-744's Designation Table Would Have Produced A Fatally Flawed Interface, Rather Than The Invention ........................................................................60

CONCLUSION ..................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008) ...........................................................53

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006) ...........................................................33

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997) ...........................................................33

*Bayer Schering Pharma AG v. Barr Labs, Inc.*,
   575 F.3d 1341 (Fed. Cir. 2009) ...........................................................54

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*,
   501 F.3d 1254 (Fed. Cir. 2007) ......................................................46, 51

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
   607 F.3d 776 (Fed. Cir. 2010) .............................................................34

*Henckel Corp. v. Proctor & Gamble Co.*,
   560 F.3d 1286 (Fed. Cir. 2009) ...........................................................29

*In re Aoyama*,
   656 F.3d 1293 (Fed. Cir. 2011) ...........................................................29

*In re Baker Hughes Inc.*,
   215 F.3d 1297 (Fed. Cir. 2000) ...........................................................29

*In re Bigio*,
   381 F.3d 132 (Fed. Cir. 2004) .............................................................41

*In re Clay*,
   966 F.3d 656 (Fed. Cir. 1992) ........................................................40, 43

*In re Donaldson Co., Inc.*,
   16 F.3d 1189 (Fed. Cir. 1994) .............................................................34

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ...........................................................29

*In re Haruna*,
    249 F.3d 1327 (Fed. Cir. 2001) ..................................................................58

*In re Jung*,
    637 F.3d 1356 (Fed. Cir. 2011) ..................................................................30

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ....................................................40, 43, 50

*In re Klein*,
    647 F.3d 1343 (Fed. Cir. 2011) ..................................................................40

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000) ..................................................................29

*In re Leithem*,
    661 F.3d 1316 (Fed. Cir. 2011) ......................................................30, 39, 52

*In re McNeil-PPC, Inc.*,
    No 99-1268, 2000 U.S. App. LEXIS 6960 (Fed. Cir. Apr. 19, 2000) ............38, 58

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) ..................................................................34

*In re Stepan Co.*,
    660 F.3d 1341 (Fed. Cir. 2011) ......................................................30, 39, 52

*In re Zurko*,
    258 F.3d 1379 (Fed. Cir. 2001) ......................................................46, 52

*Institut Pasteur & Universite Pierre v. Precision Biosciences, Inc.*,
    No. 2012-1485, 2013 U.S. App. LEXIS 25745 (Fed. Cir. Dec. 30, 2013) ....58, 60

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ..................................................................................53

*Leo Pharm. Prods. Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ..................................................................36

*Rolls-Royce, PLC v. United Tech. Corp.*,
    603 F.3d 1325 (Fed. Cir. 2010) ..................................................................53

*Ruiz v. A.B. Chance Co.*,
    234 F.3d 654 (Fed. Cir. 2000) ...................................................................51

*Yorkey v. Diab*,
    601 F.3d 1279 (Fed. Cir. 2010) ..............................................................29

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ............................................................................2

35 U.S.C. § 103 ...........................................................................................29

35 U.S.C. § 134(b) ........................................................................................2

35 U.S.C. § 141 .............................................................................................2

35 U.S.C § 142 ..............................................................................................2

## OTHER AUTHORITIES

37 CFR § 1.304(a)(1) .....................................................................................2

## TABLE OF ABBREVIATIONS

Unless otherwise indicated, the following abbreviations used in this brief have the indicated meanings:

"___:___-___"  Refers to the indicated column and lines of the patent at the indicated appendix page.

"A___"  Refers to the indicated page of the accompanying Joint Appendix.

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action or proceeding has been before this or any other appellate court.  There are no known cases pending in this court that will directly affect or be directly affected by the pending appeal.  The following pending cases may directly affect or be directly affected by the pending appeal:

| No. | Proceeding | Status |
|---|---|---|
| 1 | *In the Matter of Certain Products Containing Interactive Program Guide and Parental Control Tech.*, Inv. No. 337-TA-747 (I.T.C. 2010) | Terminated |
| 2 | *Rovi Corp. et al. v. Toshiba Corp. et al.*, Case No. 1:10-cv-00931 (D. Del 2010) | Terminated |
| 3 | *In the Matter of Certain Products Containing Interactive Program Guide and Parental Controls Tech.*, Inv. No. 337-TA-820 (I.T.C. 2011) | Terminated |
| 4 | *Rovi Corp. et al. v. Haier Grp. Corp. et al.*, Case No. 1:11-cv-01140 (D. Del 2011) | Pending |
| 5 | *Rovi Corp. et al. v. Vizio Inc.*, Case No. 1:11-cv-01129 (D. Del 2011) | Terminated |
| 6 | *In the Matter of Certain Products Containing Interactive Program Guide and Parental Control Tech.*, Inv. No. 337-TA-845 (I.T.C. 2012) | Terminated |
| 7 | *Rovi Corp. et. al. v. Mitsubishi Elec. Corp. et al.*, Case No. 1:12-cv-00547 (D. Del 2012) | Terminated |

## JURISDICTIONAL STATEMENT

The U.S. Patent and Trademark Office exercised jurisdiction in this proceeding in accordance with 35 U.S.C. § 134(b). The Patent Trial and Appeal Board entered its final decision on appeal on August 6, 2013, affirming the final rejection of claims 1-13 of U.S. Patent No. 6,701,523 in Reexamination Nos. 90/011,528 and 90/011,550 (merged). Index Systems filed a timely Notice of Appeal in the United States Patent and Trademark Office on September 30, 2013 in accordance with 35 U.S.C § 142 and 37 CFR § 1.304(a)(1).

This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.

## STATEMENT OF THE ISSUES

1.    Did the Patent Trial and Appeal Board ("Board") err as a matter of law in affirming the reexamination Examiner's obviousness rejection of the claims of U.S. Patent 6,701,523 by misconstruing the claims and concluding, for the first time in the reexamination, that they do "not recite a two dimensional matrix *user interface* or a two dimensional matrix *interface*," where the claim language defines a user interface, the specification repeatedly describes the invention as a "user interface," and the Examiner characterized the claims as a "user interface"?

2.    Did the Board further err as a matter of law in relying on EIA-744 as prior art to invalidate the claims for obviousness, by failing to analyze whether the prior art is analogous, and instead presuming a person of ordinary skill in the art would have considered EIA-744 simply because it was "available"?

3.    Did the Board err in defining the level of ordinary skill in the art at the time of the invention to be "someone who had experience in designing displays," where that definition is described for the first time in the Board's Decision and finds no support in the record?

4.    In view of the foregoing errors, did the Board err in affirming the Examiner's rejections for obviousness of all claims of U.S. Patent No. 6,701,523?

## STATEMENT OF THE CASE

Index Systems, Inc. is the assignee of U.S. Patent No. 6,701,523, entitled "V-Chip Plus+In-Guide User Interface Apparatus and Method for Programmable Blocking of Television and Other Viewable Programming, Such as for Parental Control of a Television Receiver."

Two *ex parte* reexaminations of the '523 patent were requested in March and April 2011, Control Nos. 90/011,528 and 90/011,550. The proceedings were merged and, on March 7, 2012, the Examiner issued a Final Rejection of claims 1-13, finding claims 1-5 and 7-13 obvious over Casement (U.S. Patent No. 5,969,748) in view of EIA-744 (a publication entitled "Transport of Content Advisory Information Using Extended Data Service (XDS)"), and claim 6 obvious over Casement, EIA-744, and Abecassis (U.S. Patent No. 5,610,653). Index Systems appealed to the Board, which affirmed the rejections on August 6, 2013.

Index System timely filed a Notice of Appeal to this Court on September 30, 2013 from the Board's decision.

## STATEMENT OF FACTS

### I.    THE '523 PATENT

Index Systems' '523 patent relates to a user interface for a television parental control system to enable a user, such as a parent, to block viewing of objectionable television programming.  A29-65.

### A.    The Patent's Disclosure

The '523 patent is entitled "V-Chip Plus+In-Guide User Interface Apparatus and Method for Programmable Blocking of Television and Other Viewable Programming, Such as for Parental Control of a Television Receiver."  The patent describes the "present invention" as "an apparatus and method that provides an In-Guide user interface for programmable blocking of viewable programs, such as for parental control of a television receiver."  A57 (1:19-22).  More particularly, the invention relates to a system and method for implementing a user interface for a television system to better facilitate a user blocking or allowing the viewing of program content in view of "V-Chip" technology then being proposed by Congress.  A57 (1:27-29).

With V-Chip, codes are sent in the vertical blanking interval ("VBI") of a standard television signal indicating rating factors for the program then being aired.  The rating factors could include Motion Picture Association of America ("MPAA") ratings such as the familiar G, PG, PG-13, R, and NC-17 movie theater ratings, and ratings of individual content categories such as violence, language,

nudity, and sexual content.  A57 (1:25-37).  As the patent explains, a consumer V-

Chip television system:

> would allow a consumer to program his or her television system to
> exclude programs according to their preferred levels of one or more of
> these rating criteria or alternatively could be programmed to permit
> only programs having certain levels of content according to these
> rating categories.

A57 (1:37-42).

A preferred embodiment of the user interface display of the claimed

invention is illustrated in FIG. 24A (A54):



*FIG.24A*

*See* A54.

The patent explains Fig. 24A is:

> a television screen … displaying an … embodiment of the V-Chip
> Plus+In-Guide *User Interface* 'By Ratings' *interface* screen for TV

> Ratings Codes and Content Codes in grid format with sample viewer-
> defined blocking selections.

A58-59 (4:66-5:3; emphasis added). More particularly, the figure shows a two-dimensional matrix of tiles with rows corresponding to TV age-based ratings ("TV-Y," "TV-Y7," etc.) listed in the left "header" (110), and columns corresponding to program content indications (Sex, Language, Violence, and Suggestive Dialog listed in the top "header" (114). A61 (10:48-54).

The row and columns corresponding to highlighted tiles 100 and 102 indicate the characteristics of programs to be blocked, with the blocking being implemented by selecting the "BLOCK" action button in the "GUIDE PLUS+" taskbar at the upper left-most part of the screen. The '523 patent explains:

> Each grid tile represents a particular combination of a TV Ratings Code and a TV Content Code. The Master/Administrator uses the up/down and left right/arrow keys on the viewer's remote control device to highlight a grid tile. When the appropriate grid tile is highlighted, the Master/Administrator presses the Blue action button on the Guide Plus+ task bar to select that particular Rating/Content Code grid tile to be blocked. When the Master/Administrator selects a particular Rating/Content Code grid tile to be blocked, the grid tile for that particular code turns red, or some other color to indicate selection of that tile. In FIG. 23a [*sic*., 24a], ***tiles 100 and 102 … have been highlighted, selected, and turned red (or some other color) to indicate they have been selected.*** Thereafter, programs that are rated TV-PG and have either L or V content codes ***will be blocked***.

A61 (10:32-47; emphasis added).

Also highlighted in Fig. 24A are three tiles in the leftmost header column ("TV-14," "TV-MA," and "UNRATED"). Each tile selects an entire

corresponding TV Rating Code for blocking. A61 (10:48-55). For instance, by
highlighting and selecting the TV-MA tile, all shows coded "TV-MA" (for mature
audiences) will be blocked irrespective of the shows' content codes. Highlighting
an S, L, V, or D tile similarly blocks programs having the corresponding content
code irrespective of the program's age-based rating. *Id*. Tiles also can be
deselected to unblock (allow) program content. A61 (10:5-10).

A block circuit diagram embodiment "according to the present invention" is
shown in Fig. 1 (A31):



A58 (3:38-40). Fig. 1 shows the system is controlled by remote control 56
operable by a user to input commands via four cursor movement buttons and a
selection button (lower right of remote control 56, unnumbered). *See* A59 (5:36-
40). Command signal 58 corresponding to the user's actions are sent to circuitry

within VCR 50 to enable the user to select either by inclusion or exclusion

programs for television viewing.  A59 (5:25-39); *cf.* A58 (3:20-30).

### B.    The Patent's Claims

All claims 1-13 of the '523 patent are at issue on this appeal.  Claims 1 and

11 are the independent claims.  *See* A65.

Apparatus claim 1 is set forth below:

> 1.    A *system for restricting access* to television programs
> comprising:
>
>   [1]    *an input* for accepting *cursor* movement and selection
>   *commands*;
>
>   [2]    *a display* that *depicts a two dimensional matrix*
>   composed of rows and columns of tiles, wherein either
>   the rows of tiles or the columns of tiles correspond to
>   overall program ratings and either the rows of tiles or the
>   columns of tiles correspond to specific program content
>   indications and *depicts highlighting of* individual *tiles* or
>   groups of tiles *based on the cursor movement
>   commands*; and
>
>   [3]    *means for blocking or allowing viewing of television
>   programs* based on the overall program ratings and
>   specific content ratings of the rows and columns
>   *corresponding to the highlighted tiles when a selection
>   command is entered into the input*.

*Id.* (emphasis and bracketed numerals added).  Independent claim 11 is similar to

claim 1, except it is written as a method.  *See id.*[1]

---

[1]    For the Court's convenience, both independent claims are reproduced on the
inside front cover of this brief.

## II.   THE PRIOR ART

### A.   Casement

Casement describes a "television schedule system with a  user interface which allows a user to control access to television programs by time, rating, content, and/or channel."  A2492 (Abstract).  The user interface is displayed on a TV screen "when the user elects to lock programs by rating and/or content." A2507 (4:43-45).  This list-based display is item 60:



FIG. 2D.

A2496 (Fig. 2D); *cf.* A2506 (2:10-12).  *See* A1831 (Bristow First Supp. Decl. ¶16).

In FIG. 2D, "***two lists*** are shown to the user, one by rating, and one by content." A2507 (4:45-46; emphasis added).  An age-based ratings list is on the left ("RATING") and a content categories list is on the right ("CONTENT").  A user "may lock by content and/or rating by highlighting the relevant content and/or

rating on the pop-up and inputting the SELECT key." A2507 (4:46-48). *See* A1831 (Bristow First Supp. Decl. ¶16).

Although not shown in Fig. 2D, Casement also teaches that "the content description on pop-up 60 may include information corresponding to data supplied by the V-chip." A2507 (4:50-52). Casement says, "[h]ence, the user may further *lock out programs by V-chip classification*." A2506 (1:35-40; emphasis added). Casement teaches to implement V-chip content data in the Content list by including the information in parentheses:

> *The V-chip data may be enclosed within parenthesis* and will indicate the V-chip attribute classification of the program. For example, the content category "Violence" may have corresponding V-chip attribute mildly violent (V2), moderately violence (V3), and the like.

A2507 (4:52-57, emphasis added). *See* A1832 (Bristow First Supp. Decl. ¶17).

In addition to locking out programs based on a single rating and/or content combination, Casement says a user of FIG. 2D's list-based interface can select for locking "more than one category of rating and/or content." A2507 (4:49-50). A user of Casement's interface thus can independently select multiple age-based ratings and content categories for blocking. *See* A1832-33 (Bristow First Supp. Decl. ¶18).

As the Examiner recognized during the reexamination, however, Casement does not disclose a two-dimensional matrix user interface with overall program

ratings and content indications on the rows and columns, as disclosed and claimed by the '523 patent. The Examiner stated:

> Casement et al. does not explicitly teach a system for restricting access to television programs wherein either the rows of tiles or the columns of tiles correspond to overall program ratings and either the rows of tiles or the columns of tiles correspond to specific program content indications.

A2056-57 (Final Rejection); *cf.*, A1781, A1785 (11/29/11 Office Action).

### B. EIA-744

EIA-744 is an engineering standards publication of the Electronic Industries Association that amends a pre-existing standard, EIA-608. A2513, A2515; A1824-25 (Bristow First Supp. Decl. ¶2).

EIA-608 was intended "to be a technical guide for those who ***wish to provide encoding equipment and/or decoding equipment*** to produce material with encoded data embedded in line 21 of the vertical blanking interval." A1857 (emphasis added); A1824 (Bristow First Supp. Decl. ¶2). To this end, EIA-608 includes many tables enumerating codes from which television broadcasters can choose to transmit different kinds of information in the television signal's VBI. *See e.g.*, A1893, A1903, A1920; A1824 (Bristow First Supp. Decl. ¶2). Television broadcast engineers can use these tables of agreed-upon codes to construct devices that can encode the data into or decode the data from the VBI. A1824-27 (Bristow First Supp. Decl. ¶¶2-3, 5-6).

As an amendment to EIA-608, EIA-744 describes a coding scheme – for use by broadcast engineers, *not* end users or user interface designers – for including both MPAA motion picture ratings data (G, PG, etc.) and new TV Parental Guidelines information (V, L, etc.) in the VBI of a television signal. A2513, A2515-16 (EIA-744); A1825, A1828 (Bristow First Supp. Decl. ¶¶3, 8). While MPAA ratings information was already a part of EIA-608 (*see* A1894), EIA-744 presented a supplemental encoding scheme in which additional bits are sent in the VBI to indicate whether the data packet represents an MPAA rating or a TV Parental Guidelines designation and, if the latter, the designation of the current program. A2516 (EIA-744); A1825 (Bristow First Supp. Decl. ¶3).

EIA-744's supplemental data coding scheme is reproduced below in two tables. The first one will be referred to as the "Character Table":

This packet includes two characters that contain information about the program's MPAA rating and the TV Parental Guidelines. These two systems are mutually exclusive, so if one is included the other shall not be. Bit 6 of both characters shall be set high. The following chart indicates the contents of the characters:

| Character | b6 | b5 | b4 | b3 | b2 | b1 | b0 |
|---|---|---|---|---|---|---|---|
| MPAA Rating | 1 | D | a1 | a0 | r2 | r1 | r0 |
| TV Parental Guidelines | 1 | (F)V | S | L | g2 | g1 | g0 |

A2516. The Character Table shows how different bits, which encode MPAA Ratings and TV Parental Guidelines information, are distributed across two 7-bit "characters" of data in the VBI of a TV signal (each character's bits designated b0-b6). *See* A1825 (Bristow First Supp. Decl. ¶3). The remainder of EIA-744

explains how each character bit may be set to encode recognizable program designations for a broadcast program.  A2516-A2519.  *See* A1825 (Bristow First Supp. Decl. ¶3).

If a television broadcast engineer desires to provide data in a program's VBI, the engineer must encode the data in a form that television receivers have been built to recognize.  A1825-27 (Bristow First Decl. ¶¶4-5).  To this end, EIA-744 includes another table indicating how the recognizable program designations are to be encoded by the two characters of VBI data.  A2517; A1826-27 (Bristow First Decl. ¶5).  This second table will be referred to as the Designation Table:

| g2 | g1 | g0 | Rating | FV | V | S | L | D |
|----|----|----|--------|----|----|----|----|----|
| 0 | 0 | 0 | None* | | | | | |
| 0 | 0 | 1 | "TV-Y" | | | | | |
| 0 | 1 | 0 | "TV-Y7" | X | | | | |
| 0 | 1 | 1 | "TV-G" | | | | | |
| 1 | 0 | 0 | "TV-PG" | | X | X | X | X |
| 1 | 0 | 1 | "TV-14" | | X | X | X | X |
| 1 | 1 | 0 | "TV-MA" | | X | X | X | |
| 1 | 1 | 1 | None* | | | | | |

\* No blocking is intended per the program rating criteria.

Bits (F)V, S, L , and D may be included in some combinations with bits g0-g2. Only combinations indicated by an X in the above table are allowed. Note that when the guideline category is TV-Y7 then the V bit shall be the FV bit.

FV - Fantasy Violence
V  - Violence
S  - Sexual Situations
L  - Adult Language
D  - Sexually Suggestive Dialog

A2517.  Age-based ratings TV-Y, TV-Y7, etc. are explained in EIA-744 at A2517-18.

As seen above, the Designation Table's caption states: "[o]nly combinations indicated by an X in the above table are allowed." *Id.* That is, only those program designations identified with an "X" have a corresponding recognizable code that can be transmitted in the VBI. *Id.*; A1826-27 (Bristow First Supp. Decl. ¶5). For instance, "TV-PG/D" is a recognizable program designation but "TV-MA/D" is not. A2516; A1826-27 (Bristow First Supp. Decl. ¶5).

To construct a code for any of the recognizable program designations, an engineer would note from the Designation Table how to set bits g2, g1, and g0 in the Character Table to encode a particular age-based rating (*e.g.*, TV-Y or TV-14). A1827 (Bristow First Supp. Decl. ¶6). The engineer would also note whether any of the content indicators (TV, V, etc.) are to be appended to the age-based rating (observing that *only* the combinations indicated with an "X" in the Designation Table are recognizable encodings). *Id.* The engineer would then have to set other bits in the Character Table. *Id.* After all bits are properly set, they can be transmitted to television receivers in the VBI of the program, to be decoded upon receipt at the television receiver to recover the program designation. *Id.*

For example, the Designation Table indicates that a program can be assigned a TV-MA rating by setting bits g2 and g1 (in bit positions b2 and b1) to a binary value of 1 and setting the g0 bit (in bit position b0) to a binary value of 0. The Designation Table further indicates – by way of the "X" in the "S" column of the

"TV-MA" row – that when the g2 through g0 values are set for TV-MA, the "S" bit (bit position b4) can also be set to 1 also to encode the show as S because TV-MA/S is a recognizable encoding. Thus, the broadcast engineer would cause the television station's transmitter to send the following bits in the VBI of the transmitted television signal:

| Character | b6 | b5 | b4 | b3 | b2 | b1 | b0 |
|---|---|---|---|---|---|---|---|
| MPAA Rating | 1 | D=0 | $a_1$=0 | $a_2$=1 | $r_2$=0 | $r_1$=0 | $r_0$=0 |
| TV Parental Guidelines | 1 | F(V)=0 | S=1 | L=0 | $g_2$=1 | $g_1$=1 | $g_0$=0 |

Importantly for this appeal, however, the Examiner recognized and told the Board that EIA-744 does not disclose a user interface. The Examiner said:

> EIA-744 defines the standards for encoding TV Parental Guideline ratings and content codes into a vertical blanking interval of broadcast television signals, and **not a user interface design**. … [T]he FCC provided **no proposed user interface** ….

A2322 (emphasis added). *See* A2035-36 (Final Rejection).

## III. THE REEXAMINATION

The only basis for the Examiner's Final Rejection was that the claims were obvious from Casement in view of EIA-744.[2] A2036, A2051, A2054. *See* A2318-20 (Examiner's Answer); A2193-96 (5/9/12 Advisory Action). The Examiner conceded that the claims were neither anticipated by Casement or EIA-744, nor

---

[2]   And, with respect to claim 6, further in view of Abecassis. A2068.

obvious from either reference alone.  *See* A2053-54, A2056-57 (Final Rejection), *cf.*, A1781, A1785 (11/29/11 Office Action); A2318-20 (Examiner's Answer); A2193-96 (5/9/12 Advisory Action).

Importantly, both Index Systems and the Examiner recognized that the claims on appeal define a user interface.  Index Systems repeatedly characterized the claimed invention as a "user interface" for a parental control system.  A1827 (1/30/12 Response).  *See* A1825-30 (1/30/12 Response); A2136-41 (4/19/12 Response); A1828-31, A1833, A1838-39 (Bristow First Supp. Decl. ¶¶8-15, 19-20, 31); A2094-97 (Bristow Second Supp. Decl. ¶¶9, 13-18); A2202, A2204, A2206 (Bristow Third Supp. Decl. ¶¶6, 14, 23); A2246, 2248-49 (Opening Brief); A2354-61 (Reply Brief). The Examiner did not take issue with these characterizations. *See, e.g.*, A1780, 1783, 1797, 1806 (11/29/11 Office Action); A2031-37, A2044-45, A2048-51, A2054, A2058 (Final Rejection); A2192-96 (5/9/12 Advisory Action); A2319-23, A2327 (Examiner's Answer); A1698, A1710 (8/30/11 Office Action).

Moreover, Index Systems and the Examiner agreed that EIA-744 does not teach or even relate to user interfaces.  Nor is there any suggestion in the record that EIA-744 teaches anything about TV displays themselves, nor does it.  A2516-19 (EIA-744); A1824-27 (Bristow First Supp. Decl. ¶¶2-7).   Index Systems' expert, Steven Bristow, explained that "EIA-744 does not address user interfaces at

all." A1828 (Bristow First Supp. Decl. ¶9). *See* A1824-31 (Bristow First Supp. Decl. ¶¶2-15); A2096-97 (Bristow Second Supp. Decl. ¶¶13-18). The Examiner agreed that "the EIA-744 reference does not address user interfaces." A2036 (Final Rejection).[3]

Index Systems thus argued that EIA-744 could not be relied on in combination with Casement. Citing to non-analogous prior art case law, Index Systems explained that EIA-744 was not in the same field as the '523 invention and would not have commended itself to the '523 patent inventors' attention. EIA-744 does not relate to user interface design, but rather concerns an entirely different endeavor – the data reception side of a user's system, and the meanings of age-based rating and content code bits in the VBI. A1979, A1981 (1/30/12 Response); A1824-25, A1827-31 (Bristow First Decl. ¶¶1-2, 8-15).

Index System also argued, however, that the claims would not have been obvious even if EIA-744 was considered. First, Index Systems explained that Casement would have led a skilled artisan down a different path. Casement

---

[3]     Just before conceding that EIA-744 does not teach a user interface, the Examiner stated that "the chosen layout to the document can itself be thought of as constituting a user interface of sorts." A2035. In response, Index Systems provided additional evidence showing that no portion of EIA-744 was suggestive of a user interface and, even more specifically, a printed page of information like the Designation Table of EIA-744 was not and did not suggest a user interface. A2097 (Bristow Second Supp. Decl. ¶¶16). *See* A2096-97 (Bristow Second Supp. Decl. ¶¶13-15, 17-18); A2139-41 (4/19/12 Response).

discloses a two-list interface – one list specifying age-based ratings and the other program content – and expressly teaches to incorporate V-chip ratings information in parentheses in the content categories list. A1984 (1/30/12 Response); *supra* at 11. Casement thus discloses how to incorporate V-chip content categories in a parental control user interface with aged-based ratings, and neither EIA-744 nor Casement provides any motivation to replace Casement's two-list solution with, or modify it to be, a matrix. A1984-85 (1/30/12 Response); A1831-33 (Bristow First Supp. Decl. ¶¶16-19).

Second, Index Systems argued that if EIA-744 taught a person of ordinary skill in the art anything, it was *not* to use the Designation Table as a user interface. The evidence showed that, because adoption of EIA-744's TV Parental Guidelines was optional and some broadcasters did not implement the Guidelines, a person of ordinary skill would not have designed a user interface that worked inconsistently or unpredictably depending on whether the channel being watched was EIA-744 compliant. A1830-31 (Bristow First Supp. Decl. ¶¶13-15). Thus, "one of ordinary skill in the art would not have designed a user interface to look like the Designation Table of EIA-744." *Id.* (¶14).

Third, Index Systems explained that an ordinary artisan would have realized that modifying Casement's two-list interface to appear and work like EIA-744's Designation Table, as the Examiner hypothesized (as explained below), would

cripple Casement's functionality by decreasing parental flexibility and allowing programs to be viewed that were intended to be blocked. Casement discloses that a user can independently block multiple different MPAA ratings and multiple levels of different content categories, such as "Adult Language" and "Profanity." But EIA-744 constrains each program to have at most a single age-based rating. For example, a show rated TV-MA/S may also have TV-14/L-level language, but EIA-744 does not allow coding for both. That show, therefore, would not be blocked with the Examiner's hypothesized grid if the user selected TV-14/L but the program was coded TV-MA/S. A1987-90 (1/30/12 Response); A1834-36 (Bristow First Supp. Decl. ¶¶20-24).

Fourth, Index Systems noted that television industry participants recognized EIA-744 as irrelevant to and not suggestive of any user interface design, and further viewed user interface design as a key point of competitive differentiation. A2139-40 (4/19/12 Response). *See* A2096-97 (Bristow Second Supp. Decl. ¶¶13-15); A2105 (Joint Comments); A2121 (Philips Reply Comments). Thus, market views would have pointed the ordinary artisan away from the Designation Table as the basis or inspiration for a user interface design. A2105, A2121, A1096-97 (¶¶13-15).

Finally, with respect to a grid-based interface created by the Examiner that he said was "modeled after" a Casement/EIA-744 combination, Index Systems

explained that the interface was fatally flawed. It would not block programs that a parent might try to block with highlighted tiles, unlike Casement's two-list interface. A2209-10 (6/8/12 Response); A2200-02 (Bristow Third Supp. Decl. ¶¶3-23). Furthermore, Index Systems showed that when errors made by the Examiner in creating his hypothesized interface were corrected, the complexity and flaws of that interface were greatly multiplied. A2210 (6/8/12 Response); A2205-06 (Bristow Third Supp. Decl. ¶¶17-23).

## IV. THE BOARD'S DECISION

In an August 6, 2012 Decision, the Board affirmed the Examiner's rejection of claims 1-13 of the '523 patent as obvious based on Casement in view of EIA-744. A2434.[4]

### A. Apparatus Claim 1

The only issue on appeal to the Board was "whether it would have been obvious to arrange the two lists of information in Casement differently by implementing the teachings of EIA-744." A2436, A2448.

The Board began its analysis with this surprising claim construction:

> Appellant presents contentions that are not supported by the wording of claim 1. First, Appellant contends "that [t]he claims on appeal are for a user interface. … This contention is not supported by

---

[4] The Board found dependent claim 6 obvious from Casement in view of EIA-744 and further in view of Abecassis U.S. Patent 5,610,653. A2451. Because claim 6 is not obvious for the reasons discussed with respect to claim 1, Index Systems does not separately argue for claim 6 in view of Abecassis.

the claim language itself or by the evidence of record.

> … Claim 1, however, does not recite a user interface ….”

A2442. The Decision further says:

> Appellant also contends that claim 1 recites a 'two dimensional matrix user interface' … Claim 1, however, recites 'a *display* that *depicts* a two dimensional matrix. … It does not recite a two dimensional matrix user *interface* or a two dimensional matrix *interface*.

*Id.* (emphasis in original).[5] The Board's construction was surprising because it was

the *first time* in the two-year reexamination that anyone suggested the '523 patent

claims do not define a user interface. *Supra* at 17.

The Board's new construction underpinned its obviousness determination.

Based on its construction, the Board concluded:

> none of Appellant's arguments regarding the purported failure of the combined references to teach a matrix user interface, a matrix interface, or any other interface are persuasive.

A2442.

Next, the Board determined the level of ordinary skill in the art. A2442-44.

In another surprise, it concluded:

> the pertinent person of ordinary skill in the art was **someone who had experience designing displays**.

A2444 (emphasis added). The Board's adopted level of ordinary skill was

surprising because, like its new claim construction, this was the *first time* in the

---

[5]     Index Systems did not argue that the claims "recite" the words "user interface." Rather, Index Systems referred to the "'523 patent's claimed two dimensional matrix interface." A2250 (Opening Brief).

reexamination that anyone defined the level of ordinary skill as being someone with "experience designing displays." Indeed, the Board's newly formulated level of ordinary skill was inconsistent with the level of ordinary skill described by expert Bristow. *See, e.g.* A1828 (Bristow First Decl. ¶8); A2444 (Decision).

Armed with its new construction and level of ordinary skill, the Board analyzed whether the claimed inventions were obvious, apparently based only on an "obvious to try" analysis. A2444-48. The Board agreed with the Examiner that there was a design need/market pressure to solve a problem based on "an FCC order requir[ing] television manufacturers to implement a system allowing parents to block objectionable broadcast content ...." A2446. Index Systems argued that, because Casement already had solved the asserted problem, there was no problem to be solved by EIA-744. A2250, A2252-54, A2256 (Opening Brief). But without disagreeing that Casement in fact had solved the purported problem, the Board said that "[t]he existence of one solution to a problem or design need does not prevent one skilled in the art from searching for or considering other solutions." A2446.

The Board also recognized, as Index Systems had argued, that there were user interface designs that could have solved the inventors' problem beyond the two purported ones identified by the Examiner. *Id.* Nevertheless, the Board rejected Index Systems' argument that the other possible designs negate obviousness, summarily concluding that "because the prior art is not vague, it

collectively guides and directs an artisan of ordinary skill toward a solution …." A2446-47.

Because EIA-744 has nothing to do with user interfaces, Index Systems argued to the Board as it had to the Examiner, based on the non-analogous art case law it had cited below (*supra* at 18), that EIA-744 would not have been pertinent to a person of ordinary skill. A2249. The Board's decision, however, contains no analysis of this issue. Instead, having *sua sponte* misconstrued the claims to be *not* directed to a user interface, and now viewing the art from the new perspective of "someone" experienced in "designing displays," the Board considered EIA-744 because "a person of skill in the art would have had access to the EIA-744 publication …." A2447. The Board said, "because EIA-744 was available, it is presumed that the person of ordinary skill knew about it and … would consider its arrangement of ratings and content." *Id*.

Finally, the Board addressed Index Systems' argument that, even assuming a person of ordinary skill would look to EIA-744 with Casement in hand, the claimed invention would not be obvious. A2449-50. Mirroring the arguments it had raised with the Examiner, Index Systems explained that if Casement and EIA-744 were in fact combined as the Examiner hypothesized, the resulting interface would be flawed because it would "allow[] a user unknowingly to make ineffective selections," would "be confusing and extremely unfriendly, would exclude several

ratings and content code information, and would be difficult to use." A2449; *supra* at 20. The Board rejected these arguments about the Examiner's hypothetical interface, stating that "claim 1 does not require that the 'means for blocking' be able to block all tiles that might be highlighted – only that it be able to block 'based on' rows and columns corresponding to highlighted tiles." A2451. *See* A2449.

### B.    Claims 2-13

After setting forth its analysis for claim 1, the Board said for independent method claim 11 only that it was "not persuaded that the Examiner erred in rejecting … claim 11 for similar reasons." A2451.

The Board affirmed the Examiner's rejection of the dependent claims because reversal was "not separately argued with particularity" with respect to dependent apparatus claims 2-10 or dependent method claims 12-13. A2451.[6]

---

[6]    In this appeal, Index Systems does not urge reversal of the rejection of the dependent claims for reasons separate from, or in addition to, those argued with respect to independent claims 1 and 11. Accordingly, this brief does not further discuss the dependent claims. Rejection of the dependent claims should be reversed for all the reasons discussed for the independent claims.

## SUMMARY OF ARGUMENT

The Board's decision affirming the reexamination Examiner's rejection for obviousness of claims 1-13 of Index Systems' '523 patent should be reversed, or at the very least vacated and remanded, because the Board made errors of law and fact in route to its affirmance.

First, the Board erred as a matter of law in construing claim 1 by holding "Claim 1 … does not recite a two dimensional matrix user *interface* or a two dimensional matrix *interface*" (emphasis in original). The Board's new construction, never before advocated by anyone in the reexamination, is inconsistent with the intrinsic evidence of (1) the express claim language (including, in claim 1, a means-plus-function limitation that the Board failed to analyze), and (2) the patent's specification that describes the "present invention" as a "user interface" and uses that term dozens of other times including in the title. It is inconsistent as well with the Examiner's understanding of the claims.

The Board's erroneous claim construction was the lynchpin of its incorrect obviousness determination. Based on its new claim construction, the Board concluded that "none of Appellant's arguments regarding the purported failure of the combined references to teach a matrix user interface, a matrix interface, or any other interface are persuasive." And because the Board's construction was entirely new, Index System improperly was denied the opportunity to respond to the

Board's construction and its obviousness determinations flowing therefrom.

Second, the Board's erroneous construction led it to bypass whether EIA-744 was analogous art that may be considered in the obviousness analysis. Instead of analyzing that issue, the Board concluded that because "a person of skill in the art would have had access to the EIA-744 publication," it was therefore presumably "available" and could be considered in the analysis. But, in fact, EIA-744 is not analogous. It is from a different field of endeavor than the '523 patent and not reasonably pertinent to the problem solved by the patent. Without EIA-744, the claims cannot be obvious because the Examiner conceded that obviousness was not shown from Casement alone.

Third, the Board erred in defining the level of ordinary skill in the art. It adopted a definition – "someone who had experience designing displays" – that had never been advanced by Index Systems or the Examiner and for which there was no support.

Finally, even if EIA-744 is considered analogous art (it is not), the Board erred in its obviousness analysis of Casement in view of EIA-744. The Board adopted the Examiner's "obvious to try" theory of obviousness. This approach requires that there be (1) a recognized design need and (2) a finite number of identified solutions having a reasonable probability of success. But the Board failed to show that there were only a finite number of solutions having a reasonable

probability of success.  The Examiner admitted there were other solutions, but did not identify how many solutions he believed existed or what those solutions might be.  In any event, there is no evidence that EIA-744 was a solution to the user interface problem.  It wasn't, because it discloses no solution at all.  It does not concern user interfaces.

Other evidence confirms the invention was not obvious to try, or obvious under any other theory.  Casement expressly taught how to incorporate V-Chip information into his two-list interface, and neither Casement nor EIA-744 provides any motivation to change Casement's two-list solution with a matrix.

Moreover, EIA-744 taught away from the invention.  Contemporaneous comments show that manufacturers did not view EIA-744 as teaching an interface, and did not want the FCC to dictate the design of a parental control user interface.  The Examiner admitted from this that "an ordinary artisan might have been led away" from using EIA-744's Designation Table "as inspiration for a user interface design" if EIA-744 had proposed its Designation Table as an interface design.

Finally, that the '523 invention was not obvious is proven by the very interface the Examiner, in hindsight, hypothesized would have resulted from combining Casement and EIA-744.  It is fatally flawed and does not solve the inventor's problem.  Tiles could be selected and highlighted that would not block or allow any programs.

# ARGUMENT

## I.  LEGAL STANDARDS

The Board's factual findings are reviewed for substantial evidence.  *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).  The Board's claim construction determinations are reviewed *de novo* by this court without deference.  *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011); *In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000).  Other legal conclusions are also reviewed *de novo*. *In re Kotzab*, 217 F.3d at 1369.  Whether a claim would have been obvious under 35 U.S.C. § 103 is a legal conclusion based on underlying fact determinations.  *Id.*

"'Substantial evidence' is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yorkey v. Diab*, 601 F.3d 1279, 1286 (Fed. Cir. 2010) (citing *Consol. Edison Co., v. NLRP*, 305 U.S. 197, 229 (1938)).  The substantial evidence standard asks whether a reasonable fact finder could have arrived at the agency's decision.  *Id.*; *Henckel Corp. v. Proctor & Gamble Co.*, 560 F.3d 1286, 1288 (Fed. Cir. 2009). Review for "substantial evidence" requires "examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision."  *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951)).

The Board must "provide prior notice to the applicant of all 'matters of fact

and law asserted' prior to an appeal hearing before the Board." *In re Stepan Co.*, 660 F.3d 1341, 1344 (Fed. Cir. 2011). The Board may not "rel[y] on new facts and rationales not previously raised to the applicant by the examiner." *In re Leithem*, 661 F.3d 1316, 1319 (Fed. Cir. 2011). The question is whether Index Systems had a "fair opportunity to react to the thrust of the rejection." *In re Jung*, 637 F.3d 1356, 1365 (Fed. Cir. 2011). If not, this Court must vacate and remand to provide Index Systems an opportunity to respond. *See Stepan*, 660 F.3d at 1346. Whether the Board relied on a new ground of rejection is a legal issue reviewed *de novo*. *Id.* at 1343.

## II. THE BOARD'S OBVIOUSNESS DETERMINATION WAS BASED ON ERRORS OF LAW AND NO SUBSTANTIAL EVIDENCE

As explained below, the Board erred by misconstruing the claims at issue to be not directed to a parental control user interface. A242. As a result of this miscomprehension, the Board ignored Index System's arguments as to why EIA-744 was non-analogous art and mis-defined the level of ordinary skill the art.

These errors collectively caused the Board to err in affirming the Examiner's rejection of the claims. The only basis for the rejection was that Casement in view of EIA-744 allegedly made the claimed inventions obvious. A2444-47. But it is undisputed that EIA-744 has nothing to do with user interfaces. *Supra* at 17-18. Because the Examiner conceded that Casement alone does not render the claims obvious (A2036, 2051, 2054), and because EIA-744 is non-analogous, there was

no basis for the Examiner to find the claims obvious.  But the Board, relying on its erroneous claim construction, never reached this issue.

Moreover, even if EIA-744 is considered analogous, the Board erred in analyzing whether the combination of Casement and EIA-744 renders the claims obvious.  When the proper construction and level of skill are applied, the cited prior art does not support the Board's affirmance of the Examiner's rejections.

### A.   The Board Erred As A Matter Of Law By Misconstruing The Claims To Be Not Directed To A User Interface

#### 1.   The Claims Define A User Interface

The claims define a "user interface."  The patent says so, the reexamination history says so, and the Examiner says so.

**The Claim Language.**  Citing to Index Systems' expert Bristow, the Board recognized that a user interface "[i]s something that involves interaction with a user to effectuate the user's control instructions."  A2442 (citing A2097 (Bristow Second Supp. Decl. ¶16)).  The Board asserted that "Claim 1 nowhere recites interaction with a user to effectuate the user's control instructions," but that is exactly what claims 1 and 11 do describe.

Claim 1, for instance, recites an interrelated set of limitations including:

- "an ***input*** for accepting ***cursor movement and selection commands***,"

- a "display that depicts a two dimensional matrix … and depicts highlighting of … tiles … ***based on the cursor movement***

*commands*," and

- a "means for blocking or allowing viewing of television programs … *corresponding to the highlighted tiles when a selection command is entered into the input*."

A65 (emphasis added). *See supra* at 9 and inside front cover. Claim 11 is an

analogous method claim, and similarly recites:

- *"inputting cursor movement and selection commands*,"

- "displaying a two dimensional matrix … and depicts highlighting of … tiles … *based on the cursor movement commands*," and

- "blocking or allowing viewing of television programs … *corresponding [to] the highlighted tiles when a selection command is entered into the input*."

*Id.* Plainly, the cursor movement and selection commands driving the entirety of

the claims come from a user.[7]

That the above emphasized limitations are responsive to input from a user is

demonstrated by the patent's specification. Figure 1 shows, in relevant part, that a

user interacts with the user interface of Figure 24A by inputting movement and

selection commands into the system via remote controller 56. A31. The remote

control sends a corresponding command signal 58 to a "Command Signal

Receiver" within the system's circuitry. The patent states:

As shown in FIG. 1, the circuitry is generally embedded within a VCR

---

[7]    That the '523 patent's claims are for a user interface is confirmed as well by the dependent claims. Dependent claim 5 says the display of claim 1 "allows a user" to block or enable viewing of programs globally. A65 (17:48-18:5).

50 connected between a television signal input 52 and a television monitor or display 54. *The parental control circuitry may be controlled by an input or remote controller 56 sending a command signal 58 to the circuitry to permit the user to select* either by inclusion or exclusion the particular source and/or programs, channels, dates and times available for television viewing.

*   *   *

*The Master/Administrator uses the up/down and left/right arrow keys on the viewer's remote control device to highlight a grid tile*. When the appropriate grid tile is highlighted, the *Master/Administrator presses the Blue action button on the Guide Plus+task bar to select* that particular Rating/Content Code grid tile to be blocked.

A59, A61 (5:33-40, 10:34-39; emphasis added); *cf*., A2246-47 (Opening Brief)**.**

*See also* A54, A61-62 (Fig. 24A; 9:40-11:22).

The last element of claim 1, written in means-plus-function format (*supra* at 9), also shows that the claim is for a user interface. Construction of a means-plus-function limitation requires two steps. "First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent .…" *Applied Med. Res. Corp. v. U.S. Surgical Corp*., 448 F.3d 1324, 1332 (Fed. Cir. 2006). A "corresponding structure" is one that is "clearly link[ed] or associate[d]" to the recited function in the specification or prosecution history. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

The patent discloses that structure for performing the claimed function of "blocking or allowing viewing of television programs based on … highlighted tiles

*when a selection command is entered into the input*" includes at least the user interface of Fig. 24A. A65 (17:28-32).[8] But although the Board decided to construe the claim anew, it paid no attention to how the claimed means should be construed, or even to the complete claim language reciting the function to be performed. A2441-42.[9]

It was legal error for the Board to ignore claim 1 and 11's express language and also to fail to construe claim 1's means-plus-function limitation in connection with making its patentability determination. *In re Donaldson Co., Inc.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) ("the PTO may not disregard the structure disclosed in the specification corresponding to [means-plus-function] language when rendering a patentability determination"). *See In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011) (reversing Board's claim construction because, *inter alia*, it "ignores the claim language."); *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 782 (Fed. Cir. 2010) (criticizing district court's construction for "fail[ing] to give

---

[8]    The structure also includes circuitry within Fig. 1 –a memory, a microprocessor, and a blocking circuit. *See* A31, A58, A61-62 (3:20-30; 9:40-11:22; FIG. 1). This detail, however, is not relevant to the user interface issues on this appeal.

[9]    Although Appellant's opening appeal brief to the Board identified where the '523 patent disclosed structure corresponding to the claimed means (A2247 (Opening Brief)), it did not discuss that structure, because whether or not claim 1 concerned a user interface was not at issue during the reexamination. *See infra* at 36-38.

effect to the claim language"). Had the Board analyzed the claim language, it would have recognized that its conclusion that the claims do not define a user interface was incorrect. *See* A2442, A2451.

###    2.    The Patent Describes The Invention As A "User Interface"

The '523 patent's very first words – in the title – say "V-Chip Plus+ In-Guide *User Interface* Apparatus and Method ...." A29 (emphasis added). Thereafter, the written description uses the term "user interface" over four dozen times.[10] Of particular note, in its second paragraph, under the heading "Field Of The Invention," the patent says:

> *The present invention* relates ... to an apparatus and method that *provides* an In-Guide *user interface* for programmable blocking of viewable programs, such as for parental control of a television receiver.

A57 (1:15-22; emphasis added). Two columns later, the patent's "Summary Of The Invention" describes the invention similarly. A59 (3:18-23).

Further, all but one of the patent's many figures – from Fig. 2 to 25 – are described as being or displaying a "user interface." A59-60 (3:41-5:12). Perhaps most importantly, the patent describes Figure 24A – the figure that the Board recognized as disclosing the claims at issue on this appeal (*see* A2437 (Board Decision) – as a television display of a user interface:

---

[10]    The term "user interface" appears in the patent at: A57-64 (1:20; 3:21, 41-42, 57-67; 4:2-63; 6:26-28; 7:49-52; 8:5; 9:45; 10:12; 11:21-33; 12:12-16; 13:17-23, 66; 14:11-16; 15:2-21; 16:6-18, 38-39, 50, 63).

> *FIG. 24a is a television screen* in PIP format *displaying* an alternative embodiment of the V-Chip Plus+In-Guide *User Interface* "By Ratings" *interface screen* for TV Ratings Codes and Content Codes in grid format *with sample viewer-defined blocking selections*;

A58-59 (4:66-5:3; emphasis added). This user interface, which includes a display of an interactive two-dimensional grid, lists TV Ratings Codes on the left side, and TV content codes across the top, of the grid. A58-59, A61 (4:66-5:3, 10:22-33).

These written description characterizations of the invention and disclosure as a "user interface" are compelling intrinsic evidence that the Board's claim construction is incorrect. *See Leo Pharm. Prods. Ltd. v. Rea*, 726 F.3d 1346 (Fed. Cir. 2013) ("'During reexamination, as with original examination, the PTO must give claims their broadest reasonable construction consistent with the specification'" (quoting *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010)).

### 3. The Examiner Understood The Claims Define A User Interface

As explained above (*supra* at 17-18), throughout the reexamination, Index Systems repeatedly characterized the claimed inventions as being for, and differentiated EIA-744 as not disclosing, a "user interface" for a parental control system. A1981 (1/30/12 Response). *See* A1979-84 (1/30/12 Response); A2136-41 (4/19/12 Response); A1828-31, A1833-34, A1838-39 (Bristow First Supp. Decl. ¶¶8-15, 19-20, 31); A2094-97 (Bristow Second Supp. Decl. ¶¶9, 13-18); A2202,

A2204, A2206 (Bristow Third Decl. ¶¶6, 14, 23).  On appeal to the Board, Index Systems again characterized the invention as involving a user interface stating, for instance, "[t]he claims on appeal are for a user interface."  A2248.  *See* A2246, A2249; A2354-61.

The Examiner during reexamination never took issue with any of these characterizations.  *See, e.g.*, A1780, A1783, A1797, A1806 (11/29/11 Office Action); A2031-37, A2044-45, A2048-51, A2054, A2058 (Final Rejection); A2192-96 (5/9/12 Advisory Action); A2319-23, A2327 (Examiner's Answer).  *See also* A1698, A1710 (8/30/11 Office Action).  To the contrary, the Examiner expressly recognized that the claims defined a user interface.

For example, with respect to claims 1 and 11 the Examiner relied on Casement as allegedly teaching "**a system for restricting access to television programs** (see disclosure of … a user interface …) substantially as claimed…" A2054, A2058 (Final Rejection; emphasis in original).  The Examiner's understanding that the claims define a user interface also is demonstrated from his having cited Casement for its disclosure of a 2-list parental control user interface, and having argued (erroneously) that it would have been obvious to modify Casement's use interface in view of EIA-744 to produce the claimed invention. A2054-58 (Final Rejection).

Nor did the Examiner argue to the Board that the claims were not for a "user

interface." *See* A2319-23, A2327 (Examiner's Answer). The Examiner instead acknowledged that "the Patent Owner argues that **the claimed two-dimensional interface**" was not obvious. A2318, A2320 (Examiner's Answer; emphasis added). *See* A2319, A2343-45 (Examiner's Answer).

In view of all of the foregoing, Index Systems respectfully submits that the Board erred in construing the claims as not defining a user interface and, as a direct consequence, in holding that "none of Appellant's arguments regarding the purported failure of the combined references to teach a matrix user interface, a matrix interface, or any other interface are persuasive." A2442. For this reason alone – although there are additional reasons, discussed below – the Board's rejection of the claims on appeal should be reversed. *See In re McNeil-PPC, Inc.*, No. 99-1268, 2000 U.S. App. LEXIS 6960, at *1 (Fed. Cir. Apr. 19, 2000) ("Because the Board erred in construing the claims . . . and because, properly construed, the inventions of the subject claims are [not] obvious in light of the prior art cited by the board, we reverse").

### 4. Index Systems Had No Opportunity To Respond To The Board's New Claim Construction

The notion that the claims are not for a user interface appears for the first time in the Board's Decision. Accordingly, if the Board's affirmance is not reversed (as it should be, *see supra* II.A.3, *infra* II.B.3, II.C.3, and II.D), at the very least the Decision should be vacated and the case remanded. Index Systems had no

opportunity to address the Board's new construction, which underpins its entire Decision. *See Stepan*, 660 F.3d at 1346 (vacating and remanding because patentee did not have prior notice of Board's findings). As this Court said in *In re Leithem*, 661 F.3d at 1317, 1319:

> Because the Board, in affirming the examiner's rejection, relied on a new ground of rejection, this court vacates and remands.
>
> \*     \*     \*
>
> Under the Act, an applicant for a patent who appeals a rejection to the Board is entitled to notice of the factual and legal bases upon which the rejection was based.

## B. The Board Erred As A Matter Of Law By Failing To Consider Whether EIA-744 Is Analogous Prior Art

The Board's erroneous claim construction led it to commit a second legal error. In deciding that EIA-744 could be considered in its obviousness determination, the Board relied on the wrong legal standard. The Board stated that "a person of skill in the art would have had *access* to the EIA-744 publication," and concluded that "because EIA-744 was *available, it is presumed that the person of ordinary skill knew about it* …." A2447 (emphasis added).[11] But the

---

[11]    The Board asserted that Index Systems "agree[d] that a person of skill in the art would have had access to the EIA-744 publication," pointing to the transcript of the oral argument. A2447. However, in response to the Board's question of whether a skilled artisan would have had access to EIA-744, Index Systems responded, saying that "a person of skill in the art and user interface design would have no need to and wouldn't be motivated to look at EIA-744." A2482 (6:6-10). The Board replied "That's answering a slightly different question than I asked, but they wouldn't have access to it?" A2482 (6:11-12). Index Systems responded

test for determining whether prior art is properly considered in an obviousness analysis is not whether the art is "available" or "accessible" but whether the art is "analogous." Due to its erroneous claim construction, however, the Board passed over Index System's argument that EIA-744 was not analogous.

"Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the **same field** of endeavor regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is **reasonably pertinent to the particular problem** with which the inventor is involved." *In re Clay*, 966 F.3d 656, 658-659 (Fed. Cir. 1992) (emphasis added). *See In re Klein*, 647 F.3d 1343, 1352 (Fed. Cir. 2011) (Board erred in finding that references were analogous); *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006) ("References are selected as being reasonably pertinent to the problem based on the judgment of a person having ordinary skill in the art").

Here, the Board did not consider either criterion in assuming that EIA-744 could be considered. This error of law also mandates reversal; EIA-744 is not from the same field of endeavor or otherwise reasonably pertinent to the problem

---

"Well, it's a publication in that sense .... Of course they would have access to it." A2482 (6:13, 15). The Board then asked "But they would have no motivation to look at the standard?" A2482 (6:16-17). Index Systems responded "They'd have no motivation to look at the standard for purposes of designing the interface." A2482 (6:18-19).

solved by the invention.[12]

### 1.    EIA-744 Concerns A Different Field Of Endeavor

With respect to the first criterion, "this test for analogous art requires the PTO to determine the appropriate field of endeavor by reference to explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention." *In re Bigio*, 381 F.3d 132, 1325-26 (Fed. Cir. 2004) (citing *In re Wood*, 599 F.2d 1032, 1036 (CCPA 1979); *In re Deminski*, 796 F.2d 436, 442 (Fed. Cir. 1986)).  For instance, references may be within the same field of endeavor when they "have essentially the same function and structure." *Id.*

The '523 patent and EIA-744 are not from the same field of endeavor, and do not have essentially the same function and structure.  The '523 patent specification describes the "present invention" as relating "particularly, to an apparatus and method that provides an In-Guide ***user interface*** for programmable blocking of viewable programs, such as for parental control of a television receiver."  A57 (1:19-22; emphasis added).  The patent's "Summary Of The

---

[12]    The Board noted elsewhere in its Decision Index Systems' argument that it would not have been obvious to combine the teachings of EIA-744 and Casement because EIA-744 is directed to a completely different endeavor and market participants viewed EIA-744 as irrelevant to the challenge of user interface design. A2445.  But the corresponding analysis the Board performed was whether EIA-744 and Casement rendered the '523 patent obvious to try, not whether EIA-744 is analogous.  A2445-47.

Invention" says likewise.  A59 (3:19-23).

EIA-744, in contrast, is an engineering standards document defining how to encode program designations in the vertical blanking intervals of broadcast programs.  A2513-14 (EIA-744); A1828-29 (Bristow First Supp. Decl. ¶¶9-10); *supra* at 12-16.  As an amendment to preexisting standard EIA-608, the purpose of EIA-744 was "to be a technical guide for those who wish to provide encoding equipment and/or decoding equipment to produce material with encoded data embedded in line 21 of the vertical blanking interval."  A1857 (EIA-608); *supra* at 12-13.  Index Systems' expert, Bristow, explained:

> EIA-608 includes many tables enumerating the recognizable codes from which television signal providers can choose to transmit different kinds of information in the vertical blanking interval.  If this data is to be sent or used, television broadcast engineers can use these tables of agreed-upon codes to construct devices that can encode this data into or decode this data from the vertical blanking interval.
>
> As an amendment to EIA-608, EIA-744 describes a coding scheme for including both MPAA ratings information and TV Parental Guidelines information in the vertical blanking interval of a television signal.

A1824-25 (¶¶2-3).

Bristow further explained that because of these differences and more, "EIA-608/744 is not pertinent to user interface design."  A1828 (¶8).  Importantly, the Examiner agreed that EIA-744 does not appertain to a user interface:

> ***EIA-744 defines the standards for encoding*** TV Parental Guideline ratings and content codes into the vertical blanking interval of

broadcast television signals, and ***not a user interface design***.

A2322 (Examiner's Answer; emphasis added). Indeed, EIA-744 is part of a wholly different endeavor – namely, how to design television hardware to encode and decode information transmitted by television broadcasters. And the audience for EIA-744 – communications engineers who must encode or decode the data of EIA-744 – is "entirely distinct" from persons who would be charged with designing a parental control user interface. A1829 (Bristow First Supp. Decl. ¶10).

## 2. EIA-744 Would Not Have Logically Commended Itself

With respect to the second criterion, "[a] reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *In re Clay*, 966 F.2d at 659. "If a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection." *Id.* However, "[i]f [a reference] is directed to a different purpose, the inventor would accordingly have had less motivation or occasion to consider it." *Id.* "References are selected as being reasonably pertinent to the problem based on the judgment of a person having ordinary skill in the art." *In re Kahn*, 441 F.3d at 987.

Here, the evidence is that the claimed invention and EIA-744 relate to

-43-

different problems and have different purposes. Whereas the invention is an improved parental control user interface, EIA-744 is an update to EIA-608, the stated purpose of which was "to be *a technical guide for those who wish to provide encoding equipment and/or decoding equipment* to produce material with encoded data embedded in line 21 of the vertical blanking interval." A1857 (EIA-608; emphasis added). Further, the industry view was that EIA-744:

> *deals with the structure of the data packet* that will include ratings information, and *not with either control of the V-chip* by consumers *or the way in which television sets will respond to blocking instructions*.

A2105 (Joint Comments; emphasis added). The Joint Comments also said that:

> such things as the design of the screens which will be presented to parents … and other human interface issues are choices that manufacturers should be permitted to make on their own.

A2106 (Joint Comments). *See* A1828 (Bristow First Supp. Decl. ¶8); A2204-05 (Bristow Third Supp. Decl. ¶¶13-18).

Consistent with these comments, the Designation Table of EIA-744 is not displayed to any television user and exhibits no interactivity. It is merely a printed table of bit encodings for line 21 of the vertical blanking interval of a television signal. It thus is not pertinent to the user interface problem addressed by the '523 patent. A1828 (Bristow First Supp. Decl. ¶8); A2204-05 (Bristow Third Supp. Decl. ¶¶13-18).

### 3.    The Board Did Not Consider The Analogous Art Issues

The Board's Decision did not address the foregoing issues. It did not consider the fields of endeavor of the '523 patent as compared to EIA-744, or whether EIA-744 logically would have commended itself to an inventor's attention in considering the problem of how to design a better parental control user interface. *See* A2447. The Decision did not consider these issues because Index System's related arguments were based on its (and the Examiner's) understanding that the claims were directed towards a user interface – an understanding the Board rejected. A2442.

This error was material to the Board's Decision, because without EIA-744 the claims would not have been rejected. The Examiner's Final Rejection was based solely on obviousness from Casement in view of EIA-744.[13] Casement was not relied on alone as rendering any claims obvious, and no prior art other than EIA-744 was relied on for the Examiner's final rejection in combination. A2054 (Final Rejection). The Board's obviousness determination, accordingly, should be reversed.

## C. The Board Erred In Determining The Level Of Ordinary Skill In The Art

Yet another ground for reversal is that there is no substantial evidence to support the Board's finding that "the pertinent person of ordinary skill in the art

---

[13] And in the case of claim 6, Casement in view of EIA-744 and Abecassis.

was someone who had experience in designing displays." A2444. Nothing in the record indicates that this is the level of ordinary skill in the art. Neither Index Systems nor the Examiner asserted at any time during the reexamination that "experience in designing displays" defined the person of ordinary skill.

The Board's compound error contributed to its flawed affirmance of the Examiner's rejections based on EIA-744. The Decision says:

> The pertinent person of ordinary skill **is someone who designs displays. Accordingly**, because EIA-744 was available, it is presumed that **the person of ordinary skill** knew about it and, not being an automaton, **would consider** its arrangement of ratings and content.

A2447. This, accordingly, is an independent reason why the Decision should be reversed. *See Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1257 (Fed. Cir. 2007) (in reversing a lower court decision, this Court said "The district court's error in determining the level of ordinary skill in the art … tainted its obviousness analysis."); *In re Zurko*, 258 F.3d 1379, 1386 (Fed. Cir. 2001) (reversing Board's obviousness determination and stating that "Board cannot simply reach conclusions based on its own understanding … the Board must point to some concrete evidence in the record").

### 1. The Level Of Ordinary Skill Asserted By Index Systems And Accepted By The Examiner

As part of Index Systems' response to the Examiner's first rejection (A1758), and as the Board noted (A2444), Index Systems' expert opined that a

person of ordinary skill in the art:

> would have a **Bachelors in Electrical Engineering or Computer Science** and several years of **relevant experience**, such as the design or research of **computer display** <u>systems</u>, video recorders, Teletext decoders, **or** cable or satellite **TV set-top boxes** or any equivalent experience.

A1742 (¶8; all emphasis added). *See* A1739-40. Nowhere does this definition say that "designing displays" defines the level of ordinary skill in the art. Even ignoring the rest of Bristow's definition, the ordinary artisan might have relevant experience in designing computer display *systems* – which is different from experience designing displays.

The Examiner's second Office Action recognized that "resolving the level of skill in the pertinent art" was necessary to decide obviousness. A1778 (11/29/11 Office Action). But the Examiner never rejected Index Systems' expert's definition or suggested that a different one would be more appropriate. Indeed, there was no disagreement whatsoever between Index Systems and the Examiner regarding the level of ordinary skill.

During the reexamination, once the level of ordinary skill was defined by Bristow, both the Examiner and Index Systems used the phrase "one of ordinary skill in the art" and a "person of ordinary skill in the art" dozens of times.[14] So did

---

[14]    *See* A1776, A1782, A1786, A1790, A1794, A1803-04, A1812, A1814-16, A1818 (11/29/11 Office Action); A1710, A1712, A1715 (8/30/11 Office Action);

Bristow.[15]

Four times, though, Bristow's declarations referred to "[o]ne of skill in the art of user interface design," "one of ordinary skill in the art of user interface design," or "a person of ordinary skill in the art of user interface design." *See* A1829-31 (¶¶12, 15); A2097 (¶16); A2202 (¶6). These references to "skill in the art of user interface design" are not redefinitions of the level of skill, but simply short-hand recognitions of the fact that the claimed inventions are directed to a user interface and prior art would have been considered by a person of ordinary skill in the art in that context.

Before the Board, the Examiner and Index Systems likewise referred to a person of "ordinary skill in the art" or an "ordinary artisan" dozens of times.[16] But on a handful of occasions, both the Examiner and Index Systems used Bristow's short-hand expression. The Examiner referred to an "ordinary artisan in the art of user interface design" and Index Systems referred to a person of "ordinary skill in the art of user interface design." *See* A2319, 2321 (Examiner's Answer); A2257,

---

A2320 (11/12/12 Examiner's Answer); A2031, A2036, A2057, A2061, A2065, A2070(Final Rejection).

[15] *See* A1828-31, A1333, A1835-38 (¶¶8-9, 11-12, 14-15, 19, 24, 28); A2092-97 (¶¶3-4, 9-10, 12-13, 15, 18); A2203-04, A2206 (¶¶10, 12, 14, 16, 21).

[16] *See* A2248-66 (Opening Brief, 36 times); A2318-32, A2336, A2346 (Examiner's Answer, 24 times); A2354-63 (Reply Brief, 16 times).

2260-61 (Opening Brief); A2354, A2356 (Reply Brief).[17]

Although the Examiner also used Bristow's short-hand expression, the Board singled out for criticism Index Systems' briefs as supposedly containing "suggestions … that the pertinent person of ordinary skill in the art was an interface designer." A2444. These references by Index System – like the Examiner's similar statements – did not suggest that the level of ordinary skill was anything other than that defined by Bristow. Both Index Systems and the Examiner were simply acknowledging that the '523 invention relates to a user interface.[18]

### 2. No Substantial Evidence Supports The Board's Finding Of The Level Of Ordinary Skill

Despite the reexamination history, the Board rejected Bristow's definition of ordinary skill. It also found that a person of ordinary skill would not be a "user interface designer." A2444. Instead, "[b]ased both on the claim language and Mr.

---

[17] Index Systems' briefs also referred to person of "ordinary skill in the art in designing a user interface," and "ordinary skill considering designing the claimed interface." *See, e.g.*, A2254, 2257, A2354, A2356.

[18] During its argument to the Board, Index Systems did reference "[a] person of ordinary skill in the art" as being "skilled in designing interfaces, user interfaces." A2482 (6:4-5). In so doing, Counsel used the short-hand expression that Bristow, the Examiner, and Index Systems sometimes used and, in that sense, misspoke. But, in any case, one of ordinary skill in designing user interfaces would fit within Mr. Bristow's definition of skill in the art in any case since a user interface designer would have experience designing "computer display *systems*." *See* A1739-42 (¶¶1-8).

Bristow's Initial Declaration," the Board concluded that "the pertinent person of ordinary skill in the art was ***someone*** who had experience in ***designing displays***." *Id.* (emphasis added). This was error.

First, the Board's definition is inconsistent with Bristow's definition of ordinary skill, and is not supported by any evidence in the record, despite the Board's representation that the level of skill in the art is "based … on" the definition in Bristow's first declaration and the claim language. A2444. Bristow did not opine that one of ordinary skill would have experience in "designing displays." Rather, he opined that one of ordinary skill would be someone with a computer science or electrical engineering degree and would have certain types of experience, such as experience in designing "***computer*** display ***systems***" or, *e.g.*, TV set-top boxes. A1742 ( ¶8, emphasis added).

Second, the Board erred in failing to explain how "designing displays" rationally derives from the claimed invention. *See In re Kahn*, 441 F.3d at 988 ("rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."). In fact, it does not.

In crafting its level of ordinary skill, the Board stated that it considered the "claim language," but apparently looked only at the "display" limitation of the claims. That is only one of multiple claim limitations. The claimed "input for

accepting cursor … commands" and "means for blocking or allowing …" (and related limitations from method claim 11) are not limited to displays (*see* A65), and there is no basis for saying with respect to these limitations that a person of ordinary skill would have experience only in "designing displays."

When the patent and its claims are considered as a whole, it is manifest that the Board's level of ordinary skill cannot be right. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666-67 (Fed. Cir. 2000) (factors to be considered in determining level of ordinary skill include "the types of problems encountered in the art" and "the prior art solutions to those problems"); *Daiichi*, 501 F.3d at 1257 (considering, *inter alia*, the art involved in the patent, the problem the invention was trying to solve, and the details of the patent's written description). The Board's belief that the claims do not relate to a user interface may have impacted its definition of ordinary skill and its rejection of the level of ordinary skill applied during the reexamination, when both Examiner and Index Systems understood that the claims related to a user interface.

### 3. The Board's Flawed Level Of Ordinary Skill Mandates Reversal

Ultimately, the Board's definition of ordinary skill is pulled from thin air. It contradicts the record and is unsupported by any evidence, let alone substantial evidence. That definition, therefore, should be reversed in favor of Bristow's. This is another, independent reason for reversing the Board's affirmance of the

Examiner's obviousness rejections.  *See In re Zurko*, 258 F.3d at 1386 (reversing Board's obviousness determination and stating "the Board cannot simply reach conclusions based on its own understanding or experience …the Board must point to some concrete evidence in the record in support of [its] findings.").

Even if the Board's defined level of skill in the art is not reversed, the Board's affirmance should be reversed.  There is no evidence in the record – let alone substantial evidence – addressing obviousness from the perspective of a person with experience in "designing displays."  Neither the Examiner nor Index Systems presented any evidence or arguments based on that level of ordinary skill.

If the Decision is not reversed outright, it should at minimum be vacated and remanded.  The Board's ordinary skill definition and resulting determinations are new findings to which Index Systems had no opportunity to respond.  *See Stepan*, 660 F.3d at 1346; *In re Leithem*, 661 F.3d at 1319.

### D.    Even If EIA-744 Is Analogous Prior Art, The Claims Are Not Obvious

If this Court reverses the Board's claim construction (it should), its obviousness determination also should be reversed.  Under the correct construction, the evidence as a whole does not support the legal conclusion that Casement in view of EIA-744 renders the claims obvious.  It shows, in fact, the contrary.

### 1. The Claimed Invention Was Not Obvious To Try

The obviousness theory advanced by the Examiner, and adopted by the Board, was that the claimed invention was "obvious to try" from Casement in view of EIA-744's Designation Table. *See* A2318-20 (Examiner's Answer); A2445-47 (Decision); *cf.*, A2250 (Opening Brief); A2256-57 (Examiner's Answer); A2355-56 (Reply). Substantial evidence does not support this legal conclusion.

"Obvious to try" requires that there was (1) a recognized design need or problem at the time of the invention, and (2) a finite number of known, predictable solutions to the recognized need or problem having a reasonable expectation of success. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,421 (2007). *See Rolls-Royce, PLC v. United Tech. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010) (obvious to try approach requires finite number of solutions known to persons of ordinary skill in the art); *Abbott Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008) ("obvious to try" requires that "the problem is known, the possible approaches to solving the problem are known and finite, and the solution is predictable …"). Substantial evidence does not support at least the second prong of the analysis.[19]

---

[19] Regarding the first prong, the Board apparently recognized that Casement had already solved the problem addressed by the '523 patent. A2446. Without citing to any authority, however, the Board concluded that "[t]he existence of one solution to a problem or design need does not prevent one skilled in the art from searching for or considering other solutions." *Id.* Although Index Systems does not agree with this conclusion, it does not press this issue on appeal.

### (a)    No Finite Number Of Known Solutions

The Board and the Examiner recognized that there were solutions other than the claimed invention and Casement's 2-list interface, but neither identified what those solutions were.  The Examiner said "other user interface designs could have been used" and "[t]his is not to say that there could not have been other grid-based embodiments of a user interface to support implementation of a blocking system…."  A2320, A2323 (Examiner's Answer).  And the Board recognized that the Examiner found "other designs could have been used to comply with the FCC order" and noted Index Systems' contention "that the Examiner's reference to other possible designs, standing alone, negates obviousness."  A2446.

The Board, however, rejected Index Systems' argument that the '523 invention was not "obvious to try," because it was not shown there were a finite number of solutions, based on its determination that "the prior art is not vague, it collectively guides" the solution.  *Id.*  The Board's conclusion does not logically follow.  The "not vague" requirement is separate from the requirement that there be a finite number of solutions.  *See Bayer Schering Pharma AG v. Barr Labs, Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009) ("First … the field of search [must] be among a 'finite number of identified' solutions ….  Second, an invention is not obvious to try where vague prior art does not guide an inventor …").

Here, because there was not a finite number of solutions, as recognized by

-54-

the Board and the Examiner, the Board erred in its analysis. Obvious to try is not applicable for this reason alone.

### (b)    EIA-744 Did Not Disclose A Solution

Even if there were only a finite number of solutions, the claims still would not have been "obvious to try" because there is no evidence, let alone substantial evidence, that EIA-744 disclosed *any* solution to the parental control user interface design problem. To the contrary, the evidence shows that it was not a solution.

The Examiner conceded that EIA-744 does "not [define] a user interface design" and "provided no proposed interface." A2322 (Examiner's Answer). Index Systems' expert agreed. A1828-31 (¶¶8-15); A2096-97 (¶¶13-18). Because EIA-744's Designation Table discloses no solution for the design of a user interface, the Board's conclusion that EIA-744 "directs an artisan of ordinary skill toward a ***solution***, and provides a good reason to pursue ***a known option***" has no factual support in the record. A2446-2447 (emphasis added).

In fact, the evidence affirmatively contradicts the Board's finding that EIA-744 was a "known option" for a user interface. As discussed below (sections II.D.2-4), the evidence shows that (1) Casement already solved the problem with his 2-list interface, (2) the industry viewed EIA-744 as irrelevant to the challenge of designing a user interface and did not want the FCC to dictate user interface design, (3) EIA-744 teaches away from the invention, and (4) modifying Casement

-55-

based on EIA-744 as the Examiner suggested would have produced a seriously defective interface that did not solve the user interface problem.

### 2. Casement Discourages The Invention Under The Correct Construction And Level Of Ordinary Skill

Casement discloses a parental control user interface with two lists – one for aged-based ratings, and a second for content ratings or categories. By selecting and highlighting one or more age-based ratings and one or more content categories, a user can block TV programs based on combinations of the two. *Supra* at 10-11.

Importantly, moreover, Casement solves the V-chip problem by expressly teaching to add V-chip content classifications in parentheses in the Content list of the interface. *Supra* at 11. As explained to the Board, Index Systems' expert Bristow illustrated how Casement's 2-list interface would appear based on these concise teachings:



Table II. Casement's FIG. 2D Properly Modified To Include The Age-Based Ratings And Content Codes Of EIA-744

Source: Patent Owner's Brief On Appeal, p. 23

-56-

A2093 (¶4); A2521; A2478-80.

The Board tried to diminish the impact of Bristow's example, saying it "demonstrates that one of ordinary skill in the art would, in fact, consider combining the teachings of Casement and EIA-744." A2447. The Board also incorrectly said this shows that Index Systems' arguments against combining Casement and EIA-744 "contradicts the evidence provided by its expert, Mr. Bristow." A2448. These incorrect statements take Bristow's example out of context and miss the point of what it shows.

Bristow's example was created in the context of responding to the Examiner's "conjecture" that a person of ordinary skill would combine EIA-744's program data into Casement's lists. A2092-93 (Bristow Second Supp. Decl. ¶3). Bristow never said the references would be combined by a skilled artisan and, in fact, said several times they would not be. A1833, A1835-36 (¶¶19, 24).

The point of the example was to show that if Casement and EIA-744 were combined, a person of ordinary skill in the art would *not* have come up with the Examiner's hypothetical interface or the claimed invention. Rather than creating the 2-dimensional user interface defined by the claims, a person of ordinary skill in the art would have followed Casement's *express teachings* to incorporate V-chip data directly into the 2-list interface in parentheses. A2263-65; A2092-94 (Bristow Second Supp. Decl. ¶¶3-8).

The Decision's failure to consider Casement's contrary teachings led to its erroneous affirmance, because those teachings – as Bristow showed – compellingly demonstrate non-obviousness. *See Institut Pasteur & Universite Pierre v. Precision Biosciences, Inc.*, No. 2012-1485, 2013 U.S. App. LEXIS 25745, at *19 (Fed. Cir. Dec. 30, 2013) (finding Board's failure to give proper consideration to prior art's teaching away to be reversible error); *In re McNeil-PPC*, 2000 U.S. App. LEXIS 6960, at *6-7 (concluding that under the proper claim construction, prior art teaches away, and reversing Board's obviousness determination); *In re Haruna*, 249 F.3d 1327, 1329 (Fed. Cir. 2001) ("Because Benne teaches away from the design claimed in the '031 application, we reverse the decision of the Board").

### 3. EIA-744 Taught Away Under The Correct Construction And Level Of Ordinary Skill

Not only does EIA-744 have nothing to do with user interfaces (*supra* at 17), manufacturers' comments associated with the FCC's planned implementation of EIA-744 show that EIA-744 actually *teaches away* from using the Designation Table as the basis of a user interface. *See* A2096-97 (¶¶13-15).

As earlier explained (*supra* at 20), manufacturers viewed user interface designs as providing competitive advantage. As such, they wanted free rein to design a parental control V-chip user interface as they deemed fit and did not want the FCC, through EIA-744, to dictate those designs. *See* A2096-97 (Bristow

Second Supp. Decl. ¶¶13-15); A2105 (Joint Comments); A2121 (Philips Reply Comments). There is no dispute about this – the Examiner agrees. A2321-22 (Examiner's Answer). Thus, there is no basis to argue that a person of ordinary skill in the art would have been led to design the claimed user interface from EIA-744. Rather, as Bristow explained, the market views of design independence would have led the ordinarily skilled artisan away from considering the Designation Table as inspiration for a user interface. A2096-97 (¶¶13-15).

Importantly, the Examiner admitted to the Board that "an ordinary artisan *might have been led away*" from using the Designation Table "as inspiration for a user interface design" if the Designation Table had been offered up as a proposed user interface. A2322 (Examiner's Answer). However, the Examiner asserted that "the FCC provided no proposed user interface, and the industry comments would therefore not have taught away from a manufacturer drawing inspiration for their user interface design from the Designation Table of EIA-744." *Id*. The Examiner's admission proves non-obviousness; his assertion to the contrary defies logic and is substantial evidence of nothing.

The Examiner's argument boils down to this: if EIA-744 *had* proposed the Designation Table as a user interface it would have taught away and the claims would *not* be obvious, but because the Designation Table is *not* a user interface the claims *are* obvious. This construct falls of its own weight. It makes no sense,

which may explain why the Board's Decision makes no reference to the Examiner's "led away" admission, or to Index Systems' reliance on that admission as showing non-obviousness. A2354, A2357 (Reply Brief). *See Institut Pasteur*, No. 2012-1485, 2013 U.S. App. LEXIS 25745, at *22-23 (Fed. Cir. Dec. 30, 2013) (finding Board's failure to give proper consideration to prior art's teaching away to be reversible error). For this reason, too, the Board's determination should be reversed.

### 4. EIA-744's Designation Table Would Have Produced A Fatally Flawed Interface, Rather Than The Invention

Index Systems argued to the Board that even if a person of ordinary skill had Casement and EIA-744 in hand, the claimed invention would not have been obvious because such a person would have realized that a combination of the two would have produced a fatally flawed, unworkable result. A2258-63; A2356, A1358-60.

The Examiner hypothesized that if the teachings of Casement and EIA-744 were combined, this is what would result:

| Rating | V | S | L | D |
|--------|---|---|---|---|
| "TV-Y" | | | | |
| "TV-Y7" | | | | |
| "TV-G" | | | | |
| "TV-PG" | | | | |
| "TV-14" | | | | |
| "TV-MA" | ● | ● | ● | ● |
| "None" | ● | | | |

A2189 (5/9/12 Advisory Action, showing selection of a TV-MA age-based category). The Examiner argued this interface was more straightforward and intuitive than Casement's 2-list approach. A2189-90 (5/9/12 Advisory Action). Index Systems pointed out problems with this interface.

First, unlike Casement's 2-list interface, the Examiner's hypothesized interface would allow a user to highlight and select tiles that do not result in the blocking or allowing of any programming because only certain combinations of ratings are allowed in the EIA-744. A2517 (EIA-744); A1826-27 (Bristow First Supp. Decl. ¶5). The combination of TV-G and any content code (V, S, L, or D), for example, is not supported. *See* A2517 (EIA-744); A2200-02 (Bristow Third Supp. Decl. ¶¶3-8). Thus, if a parent with the Examiner's interface highlighted and selected the tile at the intersection of TV-G and V, for instance, no TV shows would be blocked. This failure, and many more like it with other tiles, would confuse viewers who found their parental control selections had no effect. A2259-61 (Opening Brief); A2202 (Bristow Third Supp. Decl. ¶¶6-8).

Second, Index Systems showed that the Examiner's hypothesized interface was improperly simplified and omitted features that would be included if Casement and EIA-744 were combined. Rather than the above interface, this is what would have resulted from a Casement/EIA-744 combination (again, assuming an ordinary artisan would have looked at EIA-744):

| Rating | FV | V | S | L | D |
|--------|----|----|----|----|----|
|        |    |    |    |    |    |
| "TV-Y"   |    |    |    |    |    |
| "TV-Y7"  |    |    |    |    |    |
| "TV-G"   |    |    |    |    |    |
| "TV-PG"  |    |    |    |    |    |
| "TV-14"  |    |    |    |    |    |
| "TV-MA"  |    |    |    |    |    |
| None   |    |    |    |    |    |
| "G"    |    |    |    |    |    |
| "PG"   |    |    |    |    |    |
| "PG-13"  |    |    |    |    |    |
| "R"    |    |    |    |    |    |
| "NC-17"  |    |    |    |    |    |
| "X"    |    |    |    |    |    |
| Not Rated |    |    |    |    |    |

A2205 (Bristow Third Supp. Decl. ¶18). Index Systems explained to the Board, however, that this result is flawed and would not work as an acceptable user interface. A2262.[20]

[20] The Decision implies that Index Systems during oral argument agreed that it would have been obvious to arrange Casement's lists differently by implementing the teachings of EIA-744, when counsel said "that's what we did here." A2448. Counsel made no such implication, and was not even talking about the invention. Counsel was referring to the Table I demonstrative, which corrects what the *Examiner* – not Index Systems – hypothesized would be the result of combining Casement and EIA-744. A2483 (7:11-21). Counsel's comment, "so of course,

Index Systems at oral argument used the following annotated version of the Examiner's corrected grid to explain its flaws:



| Rating | FV | V | S | L | D |
|---|---|---|---|---|---|
| "TV-Y" | | | | | |
| "TV-Y7" | ✗ | | | | |
| "TV-G" | | | | | |
| "TV-PG" | | ✗ | ✗ | ✗ | ✗ |
| "TV-14" | | ✗ | ✗ | ✗ | ✗ |
| "TV-MA" | | ✗ | ✗ | ✗ | |
| None | | | | | |
| "G" | | | | | |
| "PG" | | | | | |
| "PG-13" | | | | | |
| "R" | | | | | |
| "NC-17" | | | | | |
| "X" | | | | | |
| Not Rated | | | | | |

**Table I. The Examiner's Grid Interface, As Corrected To Be Complete**
Source: Patent Owner's Brief On Appeal, p. 20

A2523 (Argument Demonstrative, Table I at p. 3); A2483-86 (Oral Argument). In Table I above, all tiles without an X will not work.

The tiles will not work because EIA-744 discloses that only those tiles marked with an X have a corresponding code in the VBI to block programs. A2517 (EIA-744). The red shading in Table I denotes tiles that are more restrictive than TV-Y7. Casement says to block these tiles automatically. A2507 (4:57-58). But in this corrected version of the Examiner's hypothesized interface, the more restrictive red tiles will *not* be blocked because EIA-744 does not provide

---

that's what we did here" merely explains why Table I has ratings on the left and content designations on the top.

any VBI codes to do so. *See supra* at 14. The resulting interface thus is inconsistent with Casement and not a proper combination.

Also flawed are the yellow and blue tiles. Casement says to block programs corresponding to the yellow tiles, but EIA-744 cannot block them and so none of the yellow tiles, if highlighted and selected, would block or allow anything. These inoperative tiles would simply confuse parents into believing they are preventing their children from watching, *e.g.*, R-rated programs when many times nothing would be blocked. And if a parent selected a D or V blue tile to block all programming having suggestive dialogue or violence, for instance, most objectionable programming would, again, not be blocked as the white, red and yellow tiles show. A2483-86 (Oral Argument). *See* A2205-06 (Bristow Third Supp. Decl. ¶¶18, 19, 21).[21]

The Board recognized that the Examiner's hypothesized combination was flawed. A2449-50. But the Board said:

> Claim 1 does not require that all combinations of rows and columns be effective or that the combinations be free from all flaws. … As claimed, claim 1 does not require that the "means for blocking"

---

[21]    The Examiner admitted that it would be necessary to further modify his hypothetical user interface "by disabling selection of those combinations of age-based ratings and content indicators not supported by the TV Parental Guidelines" to prevent users from select ratings and content code combinations that do not exist. A2323-24 (Examiner's Answer). However, the Examiner cited no evidence in support of his statement and pointed to nothing in the prior art that teaches such additional modification.

be able to block all tiles that might be highlighted – only that it be able to block "based on" rows and columns corresponding to highlighted tiles.

A2451. This is incorrect.

Claim 1 recites, in element [2], a "display that depicts a two dimensional matrix ... of rows and columns … and depicts **highlighting of individual tiles** … based on the cursor movement commands" and, in element [3], a "**means for blocking or allowing** viewing of television programs **based on** … __the highlighted tiles__ when a selection command is entered …". *Supra* at 9. Claim 11 includes similar recitations, but in method claim format. *Supra* at 32. *See also* A61. This language says if tiles are highlighted in element [2], programs *will* be blocked or allowed based on "the" highlighted tiles. The Examiner's hypothesized interface does not do this. This is what the disclosed interface does, and what the claimed means does. The patent says that when particular tiles are highlighted to indicate "they have been selected," "thereafter" programs corresponding to those tiles "will be blocked." A61 (10:45-47). That doesn't happen in the Examiner's hypothesized combination.

## CONCLUSION

For the reasons set forth above, the Board's decision that claims 1-13 of the '523 patent are obvious should be reversed, or at the very least vacated and remanded.


Dated:  January 27, 2014

By: /s/ *Laurence S. Rogers*
Laurence S. Rogers
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 596-9000
Fax:  (212) 596-9090

Megan F. Raymond
ROPES & GRAY LLP
700 12th Street, NW
Washington, DC 20005
Telephone:  (202) 508-4600
Fax: (202) 508-4650

Attorneys for Appellant
Index Systems, Inc.

# CERTIFICATE OF COMPLAINCE WITH TYPE-VOLUME LIMITATION

I certify that this brief complies with the type-volume limitation specified in Federal Rule of Appellate Procedure 32(a)(7)(B). According to the word-processing system used to prepare this document, the document contains 13,963 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

/s/  *Megan F. Raymond*

## CERTIFICATE OF SERVICE

I certify that on this 27th day of January, 2014, I electronically filed the

foregoing brief. All participants in the case are registered CM/ECF users and will

be served by the appellate CM/ECF system.

/s/ Megan F. Raymond<br>
Megan F. Raymond

Dated: January 27, 2014

**ADDENDUM**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/011,528 | 03/03/2011 | 6701523 | 004029-0114-501 | 1812 |

75563          7590          08/06/2013
ROPES & GRAY LLP
PATENT DOCKETING 39/361
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704

| EXAMINER |
|---|
| WASSUM, LUKE S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/06/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

A1

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex Parte INDEX SYSTEMS, INC.*
Patent Owner and Appellant

_____

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1[1]
Technology Center 3900

_____

Before KEVIN F. TURNER, STEPHEN C. SIU, and
STANLEY M. WEINBERG, *Administrative Patent Judges.*

WEINBERG, *Administrative Patent Judge.*


DECISION ON APPEAL



A.      STATEMENT OF THE CASE

Introduction

_____

[1] The patent involved in this reexamination appeal proceeding (the "'523 Patent") issued to Hancock et al. on March 2, 2004.

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

This reexamination proceeding arose from two third-party requests for *ex parte* reexamination filed on March 3, 2011 (Control Number 90/011,528) and April 13, 2011 (Control Number 90/011,550), respectively. The two reexaminations were *sua sponte* merged by the Office in an Order mailed on June 30, 2011. Index Systems, Inc. (Appellant), the owner of the patent under reexamination,[2] appeals under 35 U.S.C. §§ 134(b) and 306 from a Final Rejection of claims 1-13.[3] An oral hearing was conducted on April 24, 2013. A transcript of the hearing was made of record on July 18, 2013.

We have jurisdiction under 35 U.S.C. §§ 134(b) and 306.

We affirm.

Related Proceeding

Appellant has informed us about the following judicial proceedings that may be related to, directly affect or be directly affected by, or have a bearing on the Board's decision in the present appeal:

> *In the Matter of Certain Products Containing Interactive Program Guide and Parental Control Technology, Inv.*, No. 337-TA-747 (I.T.C. 2010) (Terminated).
>
> *Rovi Corp. v. Toshiba Corp.*, Case No. 1:10-cv-00931 (D. Del. 2010) (Dismissed).

---

[2] *See* Patent Assignment Abstract of Title, Reel 014522 Frame 0641 recorded September 22, 2003, and entered into the record of Control No. 90/011,528 as "Title Report" on March 10, 2011, and into the record of Control No. 90/011,550 on March 16, 2011.

[3] Appellant relies on its Appeal Brief filed August 8, 2012 ("App. Br.") and its Reply Brief filed December 11, 2012 ("Reply Br.").

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

> *In the Matter of Certain Products Containing Interactive Program Guide and Parental Controls Technology,* Inv. No. 337-TA-820 (I.T.C. 2011) (Pending as of 8/8/2012).

> *Rovi Corp. v. Haier Group Corp.,* Case No. 1:11-cv-01140 (D. Del. 2011) (Stayed as of 8/8/2012).

> *Rovi Corp. v. Vizio Inc.,* Case No. 1:11-cv-01129 (D. Del. 2011) (Stayed as of 8/8/2012).

> *In the Matter of Certain Products Containing Interactive Program Guide and Parental Control Technology,* Inv. No. 337-TA-845 (I.T.C. 2012) (Pending as of 8/8/2012).

> *Rovi Corp. v. Mitsubishi Electric Corp.,* Case No. 1:12-cv-00547 (D. Del. 2012) (Stayed as of 8/8/2012)

Appellant has also informed us of substantive examination in related U.S. Patent Application 10/682,785, assigned to Appellant, in which a Final Office Action was mailed on July 20, 1012. App. Br. 3.

## The Invention

The invention relates to a system for restricting access to television programs comprising an input for accepting cursor movement and selection commands. The system includes a display that depicts a two dimensional matrix composed of rows and columns of tiles. Either the rows of tiles or the columns of tiles correspond to overall program ratings and either the rows of tiles or the columns of tiles correspond to specific program content indications and depicts highlighting of individual tiles or groups of tiles based on the cursor movement commands. The system further includes means for blocking or allowing viewing of television programs based on the

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

overall program ratings and specific content ratings of the rows and columns
corresponding to the highlighted tiles when a selection command is entered
into the input. Abstract.

Claim 1 is representative of the appealed subject matter and is
reproduced below with disputed limitations emphasized (App. Br. 26,
Claims App'x):

> 1. A system for restricting access to television programs
> comprising:
>
> an input for accepting cursor movement and selection
> commands;
>
> a display that depicts a *two dimensional matrix* composed
> of rows and columns of tiles, wherein either *the rows of tiles or
> the columns of tiles correspond to overall program ratings* and
> either *the rows of tiles or the columns of tiles correspond to
> specific program content indications* and depicts highlighting of
> individual tiles or groups of tiles based on the cursor movement
> commands; and
>
> means for blocking or allowing viewing of television
> programs based on the overall program ratings and specific
> content ratings of the rows and columns corresponding to the
> highlighted tiles when a selection command is entered into the
> input.

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

Claim 1 relates to Fig. 24A[4] (App. Br. 4-5) which shows TV Ratings Codes listed on the left side 110 of the grid (col. 10, ll. 22-24) and TV Content Codes across the top 114 of the grid (col. 10, ll. 29-32). Each grid tile represents a particular combination of a TV Ratings Code and a TV Content Code. Col. 10, ll. 32-34. In Fig. 24A, tiles 100 and 102 have been highlighted to indicate they have been selected. Thereafter, programs that are rated TV-PG and have either L or V content codes will be blocked. Col. 10, ll. 43-47.

The Rejections

Claims 1-5 and 7-13 stand rejected under 35 U.S.C. § 103(a) as unpatentable over Casement (US 5,969,748; Oct. 19, 1999) in view of EIA-744 Standard, Transport of Content Advisory Information Using Extended Data Service (XDS) (Oct. 1997). Final Rejection 26-40.[5]

Claim 6 stands rejected under 35 U.S.C. § 103(a) as unpatentable over Casement in view of EIA-744 and further in view of Abecassis (US 5,610,653; March 11, 1997). Final Rej. 40-42.

The Expert Declarations

Appellant provides four Declarations by Stephen D. Bristow.

*The Initial Declaration*

---

[4] Appellant informs us that "[d]ue to a typographical error, the '523 patent specification erroneously refers to Fig. 24a as 'FIG. 23a.' See, *e.g.*, col. 10, lines 18, 22, 43. There is no Fig. 23A in the patent; only Fig. 24A." App. Br. 4 n.1.
[5] We refer to the Final Rejection ("Final Rej.) mailed March 9, 2012.

5

**A6**

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

The initial Declaration (dated October 27, 2011) ("Initial Decl.") opines that one of ordinary skill in the art would have, among other qualifications, "several years of relevant experience, such as the design or research of computer display systems, video recorders, Teletext decoders, or cable or satellite TV set-top boxes or any equivalent experience." Initial Decl. ¶ 8. [6]

*The First Supplemental Declaration*

The first Supplemental Declaration (dated January 29, 2012) ("First Supp. Decl.") states that EIA-744 "describes a coding scheme for including both MPAA ratings information and TV Parental Guidelines information in the vertical blanking interval of a television signal." First Supp. Decl. ¶3. It opines that it would not have been obvious "for one of ordinary skill in the art to implement a user interface in the format of the Designation Table of EIA-744" because EIA-744 "is not pertinent to user interface design" and "a user interface designer would not be presented with or asked to work from a raw data transmission standard like" EIA-744. First Supp. Decl. ¶8.

Instead, "a more typical practice would be to have a management or business team select the desired features from the [EIA-744] standard and draw up a requirements list that includes the selected features." Eventually,

---

[6] At the oral hearing, Appellant's representative asserted that a different person of ordinary skill applies to this case: "[a] person of ordinary skill in the art would be a person that's skilled in designing interfaces, user interfaces." Oral hearing transcript ("Tr.") 6:4-5. *See also, for example,* App. Br. 14 ("a person of ordinary skill in the art would not understand EIA-744 to be or to disclose a user interface"); 15 (EIA-744 "would not even commend itself to a person of ordinary skill considering designing the claimed interface.")

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

a requirements list would be provided to a user interface designer. First Supp. Decl. ¶ 8. Mr. Bristow further opines that "[o]ne of ordinary skill in the art of user interface design for consumer electronics would not look to, nor be inspired by, EIA-744 in developing a new interface or modifying an existing interface." First Supp. Decl. ¶ 15. He also opines that it would not have been obvious to replace Casement's ratings list with EIA-744's Designation Table because the replacement would reduce parents' flexibility and might allow objectionable programs to be viewed instead of being blocked. First Supp. Decl. ¶¶ 20-24.

*The Second Supplemental Declaration*

The second Supplemental Declaration (dated April 19, 2012) ("Second Supp. Decl.") opines that one of ordinary skill in the art could combine the teachings of Casement and EIA-744 to provide the following two columns having more detail than the two Casement columns and that such a combination would be user-friendly. (Second Supp. Decl. ¶¶ 4-6.

| G | Violence (TV-Y7-FV) |
| PG | Violence (TV-PG-V) |
| PG-13 | Violence (TV-14-V) |
| R | Violence (TV-MA-V) |
| NC-17 | Sexual Situations (TV-PG-S) |
| X | Sexual Situations (TV-14-S) |
| Not Rated | Sexual Situations (TV-MA-S) |
| TV-Y | Adult Language (TV-PG-L) |
| TV-Y7 | Adult Language (TV-14-L) |
| TV-G | Adult Language (TV-MA-L) |
| TV-PG | Sexually Suggestive Dialog (TV-PG-D) |
| TV-14 | Sexually Suggestive Dialog (TV-14-D) |
| TV-MA | |

Such a large combination would not overwhelm or confuse a user, he opines, because "users of television program guides at the time of Casement were

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

familiar with grid displays that required left, right, up and down scrolling to view television program listings on different channels at different times." Second Supp. Decl. ¶¶ 8-9.

Mr. Bristow also opines that although the information in EIA-744's Designation Table would be "of limited utility to a user interface designer," it would be useful to a communications engineer. Second Supp. Decl. ¶¶ 16-18.

This Declaration also explains that "a user interface involves interaction with a user to effectuate the user's control instructions." Second Supp. Decl. ¶ 16.

*The Third Supplemental Declaration*

The third Supplemental Declaration (dated June 8, 2012) ("Third Supp. Decl.") discusses an interface proposed by the Examiner in a May 9, 2012 Advisory Action that the Examiner concluded would be straightforward and intuitively easy to comprehend. Third Supp. Decl. ¶ 3. The Examiner's proposed interface, reproduced on page 2 of the Third Supplemental Declaration is shown below.

| Rating | V | S | L | D |
|--------|---|---|---|---|
|        |   |   |   |   |
| "TV-Y" |   |   |   |   |
| "TV-Y7" |   |   |   |   |
| "TV-G" |   |   |   |   |
| "TV-PG" |   |   |   |   |
| "TV-14" |   |   |   |   |
| "TV-MA" |   | ● | ● | ● |
| "None" |   |   |   |   |

8

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

This Declaration opines that the Examiner's proposed grid would not be used because it would "allow[] a user to select ratings and content code combinations that are not defined or supported by the EIA-744 standard." Third Supp. Decl. ¶ 3. For example, this Declaration opines that a user could believe the combination "TV-Y" and "L" is blocked without knowing that it was, in fact, not blocked. Third Supp. Decl. ¶¶ 4-6. This Declaration also opines that the Examiner's proposed grid fails to address the MPAA Codes and the FV TV Code, and has other flaws. Third Supp. Decl. ¶¶ 9-23.

## ANALYSIS

### Claims 1-5 and 7-13

The Examiner finds that Figure 2D of Casement teaches a display that depicts a two dimensional matrix composed of rows and columns of tiles wherein the rows and columns of tiles depict highlighting of individual tiles or groups of tiles based on cursor movement commands. Final Rej. 27-28. The Examiner also finds that page 2 of EIA-744 teaches a grid of rows and columns wherein the rows correspond to overall program ratings and the columns correspond to specific program content indications. Final Rej. 29.

The Examiner concludes that it would have been obvious to implement (not replace as suggested by the First Suppl. Decl. ¶¶ 20, 24 and as contended by Appellant at Reply Br. 5) Casement's Figure 2D in the format illustrated on page 2 of EIA-744 because the guidelines and codes in EIA-744 were approved for use in the broadcasting industry; the EIA-744 format would provide the capability for a user to establish different age-based categories for different types of content; and it would provide more

9

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

flexibility for a user in the selective blocking of programming by distinct combinations of overall program ratings and content. Final Rej. 29-30.

*Appellant's Interpretation of Claim 1*

Appellant presents contentions that are not supported by the wording of claim 1. First, Appellant contends that "[t]he claims on appeal are for a user interface." *See, e.g.,* App. Br. 6, 12; Reply Br. 4. This contention is not supported by the claim language itself or by the evidence of record.

Appellant's expert defines a user interface as something that involves interaction with a user to effectuate the user's control instructions. Second Supp. Decl. ¶ 16. Claim 1, however, does not recite a user interface as defined by Mr. Bristow. Claim 1 recites a "system for restricting access;" "an input for accepting cursor movement;" "a display that depicts" something; and a "means for blocking or allowing viewing" of something. Claim 1 nowhere recites interaction with a user to effectuate the user's control instructions or structure that could be used to implement interaction with a user.

Appellant also contends that claim 1 recites a "two dimensional matrix user interface" (App. Br. 8) and, alternatively, a "two dimensional matrix interface." App. Br. 10, 12. Claim 1, however, recites "a *display* that *depicts* a two dimensional matrix." (emphasis added). It does not recite a two dimensional matrix user *interface* or a two dimensional matrix *interface*.

Therefore, none of Appellant's arguments regarding the purported failure of the combined references to teach a matrix user interface, a matrix interface, or any other interface are persuasive.

*The person of ordinary skill in the art and what would have been obvious to such a person*

10

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

The person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention. "A person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Obviousness is determined based on what would have been obvious to the hypothetical person of ordinary skill in the art rather than to particular individuals such as Casement. *See Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir. 1984). "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference. . . .Rather, the test is what the combined teachings of those references would have suggested to those of ordinary skill in the art." *In re Keller*, 642 F.2d 413, 425 (CCPA 1981); that is, to the hypothetical person of ordinary skill in the art. *See also In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under review.").

Consistently with the language of claim 1 that recites a display, Appellant's expert, Mr. Bristow, opines that one of ordinary skill in the art would have had, among other qualifications, "several years of relevant experience, such as the design or research of computer *display systems*, video recorders, Teletext decoders, or cable or satellite TV set-top boxes or any equivalent experience." Initial Declaration ¶ 8 (emphasis added). He does not opine that the person of ordinary skill in the art would have been someone who was experienced in designing user interfaces.

11

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

Although Mr. Bristow's supplemental Declarations refer to a designer of user interfaces, he does not change his opinion regarding the pertinent person of ordinary skill in the art. For example, Mr. Bristow states it would not have been obvious for one of ordinary skill in the art "to implement a user interface in the format of the Designation Table of EIA-744" because "a user interface designer would not be presented with or asked to work from a raw data transmission standard like" EIA-744. First Supp. Decl. ¶ 8. We conclude that this statement refers to (1) Mr. Bristow's previously defined person of ordinary skill in the art; and, separately, (2) a user interface designer – a person who is different from his defined person of ordinary skill in the art.

The suggestions in Appellant's briefs that the pertinent person of ordinary skill in the art was an interface designer are not persuasive because those statements are only attorney argument, which cannot take the place of evidence. *In re Pearson*, 494 F.2d 1399, 1405 (CCPA 1974). Similarly non-persuasive is the statement of Appellant's attorney at the oral hearing that "[a] person of ordinary skill in the art would be a person that's skilled in designing interfaces, user interfaces." Tr. 6:4-5.

Based on both the claim language and Mr. Bristow's Initial Declaration, we conclude that the pertinent person of ordinary skill in the art was someone who had experience in designing displays.

Appellant contends that it would not have been obvious to combine EIA-744 with Casement under an "obvious to try" theory because there was no need or problem with Casement's two-list ratings/content interface and the Examiner failed to show that EIA-744's Designation Table was among a

12

**A13**

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

finite number of identified solutions. App. Br. 14-15. Appellant also contends it would not have been obvious to combine the teachings of the two references because EIA-744 is directed to a completely different endeavor and market participants viewed EIA-744 as irrelevant to the challenge of user interface design. App. Br. 15; Reply Br. 3. Appellant also contends that under no circumstances would a person of ordinary skill in the art consider combining Casement and EIA-744.[7] The Examiner's findings and Appellant's expert refute Appellant's contentions.

As held by the U.S. Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. at 421:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

Expanding on this analysis, the Federal Circuit in *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011) held that "[t]o render a claim obvious, prior art cannot be 'vague' and must collectively, although not explicitly, guide an artisan of ordinary skill towards a particular solution."

---

[7] "Even accepting the Examiner's premise that a person of ordinary skill in the art would consider combining the teachings of Casement with the TV Parental Guidelines system of EIA-744 (which such a person would *not* do)." App. Br. 21.

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

The Examiner finds there was a design need and/or market pressure to solve a problem. Specifically, the Examiner finds that an FCC order required television manufacturers to implement a system allowing parents to block objectionable broadcast content within a certain period of time, thereby creating a need in the art for a mechanism to implement the order. Ans. 5-6. Appellant agrees that the FCC issued such an order. Reply Br. 2-3. But, Appellant contends that there was no problem to be solved because Casement taught how to solve the problem (Reply Br. 2) and that there was no market pressure because the FCC order gave manufacturers nearly two years to plan for implementation. Reply Br. 3. We are not persuaded by Appellant's contentions.

The existence of one solution to a problem or design need does not prevent one skilled in the art from searching for or considering other solutions. As for market pressure, Appellant admits that the FCC extended the compliance deadline to allow nearly two years to plan for implementation because of market pressure; i.e., manufacturer schedules and the need to provide a smooth transition for product introduction. Reply Br. 3.

The Examiner also finds that although other designs could have been used to comply with the FCC order, two solutions would have suggested themselves to an ordinary artisan: a list-based solution and a grid-based solution. Ans. 6-7. Appellant contends that the Examiner's reference to other possible designs, standing alone, negates obviousness. Reply Br. 2. We disagree because the prior art is not vague, it collectively guides and

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

directs an artisan of ordinary skill toward a solution, and provides a good reason to pursue a known option. *See Unigene Labs* and *KSR*, *supra*.

Here, Casement's Fig. 2D provides explicit indication of which parameters were critical: ratings (e.g., "G," "PG," "PG13") and content (e.g., "Profanity," "Nudity," "Violence."). The two dimensional matrix Designation Table of EIA-744 uses very similar parameters as those in Casement's Fig. 2D, and more. For example, the EIA-744 Designation Table lists ratings (e.g., "TV-Y," "TV-G," "TV-PG") and content (e.g., "L" for Adult Language; "S" for Sexual Situations; and "V" for Violence).

Appellant agrees that a person of skill in the art would have had access to the EIA-744 publication but contends that such a person would have no motivation to look at the publication for purposes of designing an interface. Tr. 6:6-19. As stated above, however, this argument is not persuasive at least because the pertinent person of ordinary skill in the art is not a person designing an interface. The pertinent person of ordinary skill is someone who designs displays. Accordingly, because EIA-744 was available, it is presumed that the person of ordinary skill knew about it and, not being an automaton, would consider its arrangement of ratings and content.

In fact, Mr. Bristow's Second Supplemental Declaration demonstrates that one of ordinary skill in the art would, in fact, consider combining the teachings of Casement and EIA-744. More specifically, Mr. Bristow opines that one of ordinary skill in the art could devise a "natural combination of the age-based ratings and content codes of EIA-744 with Casement's blocking interface" and that "the EIA-744-Casement interface would have

15

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

been user-friendly." Second Supp. Decl. ¶ 6. Even more specifically, Mr. Bristow actually shows one possible arrangement of rating and content codes that would result from such a combination. Mr. Bristow states:

> Respecting these two teachings, one of ordinary skill in the art[8] would arrange the rating and content codes codified in EIA-744 into the following "EIA-744-Casement interface":

| | |
|---|---|
| G | Violence (TV-Y7-FV) |
| PG | Violence (TV-PG-V) |
| PG-13 | Violence (TV-14-V) |
| R | Violence (TV-MA-V) |
| NC-17 | Sexual Situations (TV-PG-S) |
| X | Sexual Situations (TV-14-S) |
| Not Rated | Sexual Situations (TV-MA-S) |
| TV-Y | Adult Language (TV-PG-L) |
| TV-Y7 | Adult Language (TV-14-L) |
| TV-G | Adult Language (TV-MA-L) |
| TV-PG | Sexually Suggestive Dialog (TV-PG-D) |
| TV-14 | Sexually Suggestive Dialog (TV-14-D) |
| TV-MA | |

Second Supp. Decl. ¶ 4. Again, therefore, Appellant's arguments in its briefs are not persuasive because they constitute attorney argument that contradicts the evidence provided by its expert, Mr. Bristow.

The only remaining issue, therefore, is whether it would have been obvious to arrange the two lists of information in Casement differently by implementing the teachings of EIA-744. In fact, Appellant agrees that EIA-744 teaches a two-dimensional matrix comprising ratings on the left and content categories on top and agrees that "that's what we did here." Tr. 8:19-23.

---

[8] As Mr. Bristow stated in his Initial Declaration, a person of ordinary skill in the art includes someone who has experience in "the design or research of computer display systems." Initial Decl. ¶ 8.

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

The Examiner concludes that "an ordinary artisan may draw on any number of sources for inspiration." Ans. 7. The Examiner further concludes that "[a] simple glance at the Designation Table would have served to convey to an ordinary artisan some of the advantages that a grid-based approach would have had over a list-based approach, given the requirement that parents be able to block programming based on age-based ratings, by content indicators, or by a combination of the two. . . .[T]he information is presented such that a viewer would quickly and easily comprehend the information being conveyed." Ans. 8 (emphasis omitted). Appellant does not dispute these conclusions. We agree with the Examiner because the Examiner has presented reasons with a rational underpinning to combine the teachings of the two references.

Finally, Appellant contends that if Casement and EIA-744 were combined, the resulting device would result in an interface that "allows a user unknowingly to make ineffective selections" would "be confusing and extremely user unfriendly" (App. Br. 18), would exclude several ratings and content code information, and would be difficult to use. App. Br. 19; Reply Br. 5-7. But, claim 1 does not require all matrix cells to be useful. Claim 1 only recites a two dimensional matrix having tiles corresponding to overall program ratings and specific program content indications. Claim 1 does not require an ability to block or allow *all* combinations of program ratings and program content indications in the recited two dimensional matrix. Instead, claim 1 recites a general blocking or allowing capability "based on" program ratings and content ratings "corresponding to . . . highlighted tiles."

17

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

Prima facie obviousness does not require certainty; but, rather, requires only a reasonable expectation of success. *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988) ("Obviousness does not require absolute predictability of success . . . . For obviousness under § 103, all that is required is a reasonable expectation of success."). Mr. Bristow and Appellant impliedly agree that a Casement-EIA-744 combination would provide a reasonable expectation of at least partial success because highlighting some of the tiles will block some programs.

- Replacing Casement's content categories and MPAA rating's lists with EIA-744's Designation Table would "reduce" parents' blocking flexibility and objectionable programs "may be allowed" (First Supp. Decl. ¶ 20) and "would allow programs to be viewed that were intended to be blocked." First Supp. Decl. ¶ 24.

- "[T]he Examiner's proposed grid interface is *incomplete* and improperly simplified. A person of ordinary skill in the art at the time of the invention of the '523 patent would not have eliminated such information from a parental control interface. Doing so would have prevented a user from (1) blocking movies based on the MPAA movie ratings disclosed by EIA-744 . . . and (2) preventing the user from blocking fantasy violence . . . . Third Supp. Decl. ¶16 (emphasis added).

- "[T]he Examiner's proposed grid interface is *incomplete* by excluding several ratings and content code information." App. Br. 19 (emphasis added).

- "The completed grid of Table I [shown on App. Br. 20], furthermore, would make a *very inefficient* interface." App. Br. 21

18

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

(emphasis added). "[O]nly 26 of the 104 cells correspond to operationally selectable options." *Id.*

Claim 1 does not require that all combinations of rows and columns be effective or that the combinations be free from all flaws. Claim 1 recites (1) a display that depicts a two dimensional matrix with tiles corresponding overall program ratings, tiles corresponding to specific program content indications and that can depict highlighting of tiles; and (2) a "means for blocking or allowing viewing. . .*based on*. . .program ratings and specific content ratings. . .corresponding to the highlighted tiles." (emphasis added). As claimed, claim 1 does not require that the "means for blocking" be able to block all tiles that might be highlighted – only that it be able to block "based on" rows and columns corresponding to highlighted tiles.

We are therefore not persuaded that the Examiner erred in rejecting (1) representative claim 1; (2) claim 11 for similar reasons; and (3) claims 2-5, 7-10, 12, and 13 not separately argued with particularity.

Claim 6

We also sustain the rejection of claim 6 because Appellant contends it "is not obvious for all the reasons already discussed, above, with respect to claims 1 and 11." App. Br. 24.

CONCLUSIONS

Under § 103, the Examiner did not err in rejecting claims 1-13.

DECISION

The Examiner's decision rejecting claims 1-13 is affirmed.

Appeal 2013-003427
Reexamination Control 90/011,528 and 90/011,550 (Merged)
Patent 6,701,523 B1

Requests for extensions of time in this *ex parte* reexamination

proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

<u>AFFIRMED</u>

PATENT OWNER:

LAURENCE S. ROGERS
ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

THIRD PARTY REQUESTER:

HARRITY & HARRITY, LLP
11350 RANDOM HILLS ROAD
SUITE 600
FAIRFAX, VA 22030

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
901 NEW YORK AVENUE, N.W.
WASHINGTON, DC  20001-4413



US006701523B1

(12) **United States Patent**

Hancock et al.

(10) Patent No.: **US 6,701,523 B1**

(45) **Date of Patent:** **Mar. 2, 2004**

(54) **V-CHIP PLUS+IN-GUIDE USER INTERFACE APPARATUS AND METHOD FOR PROGRAMMABLE BLOCKING OF TELEVISION AND OTHER VIEWABLE PROGRAMMING, SUCH AS FOR PARENTAL CONTROL OF A TELEVISION RECEIVER**

(75) Inventors: **Kenneth Hancock**, Mashua, NH (US); **Thomas Ward**, Bedford, MA (US); **Douglas Macrae**, Weston, MA (US); **Jacques Hugon**, Bedford, MA (US)

(73) Assignee: **Index Systems, Inc.**, Tortola (VG)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/398,963**

(22) Filed: **Sep. 16, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/100,575, filed on Sep. 16, 1998.

(51) **Int. Cl.**[7] .......................... **H04N 7/16**; H04N 5/445; G06F 3/00; G06F 13/00

(52) **U.S. Cl.** ............................. **725/25**; 725/27; 725/28; 725/30; 725/44; 725/45; 725/46

(58) **Field of Search** .............................. 725/25, 27, 28, 725/30, 44, 45, 46

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,896,354 A | 1/1990 | Inagaki et al. | |
| 4,930,160 A | 5/1990 | Vogel | |
| 5,045,947 A | 9/1991 | Beery | |
| 5,068,734 A | 11/1991 | Beery | |
| 5,335,079 A | 8/1994 | Yuen et al. | |
| 5,382,983 A | 1/1995 | Kwoh et al. | |
| 5,465,113 A | 11/1995 | Gilboy | |
| 5,485,518 A | 1/1996 | Hunter et al. | |
| 5,548,345 A | 8/1996 | Brian et al. | |
| 5,550,575 A | 8/1996 | West et al. | |
| 5,583,576 A | 12/1996 | Perlman et al. | |
| 5,610,653 A | 3/1997 | Abecassis | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

WO    WO 97/46016    12/1997

OTHER PUBLICATIONS

Tony Atherton; Living with the V–chip; Entertainment, The Ottawa Citizen, Sunday, Mar. 9, 1996, pp. F1–F2, Section F, Ottawa, Canada.

Glen Dickson, How's it Work? The V–chip is based on Closed–captioning Technology, Boradcasting & Cable, Feb. 12, 1996, p. 24.

John Urquhart, Canada Orders TV Industry to Devise Rating System for Use With the V–Chip, The Wall Street Journal, Friday Mar. 15, 1996, A7C, USA.

Statute, Sec. 551. Parental Choice In Television Programming.

*Primary Examiner*—John Miller
*Assistant Examiner*—Michael W. Hoye
(74) *Attorney, Agent, or Firm*—Christie, Parker & Hale, LLP

(57) **ABSTRACT**

A system for restricting access to television programs comprising an input for accepting cursor movement and selection commands. The system includes a display that depicts a two dimensional matrix composed of rows and columns of tiles, wherein either the rows of tiles or the columns of tiles correspond to overall program ratings and either the rows of tiles or the columns of tiles correspond to specific program content indications and depicts highlighting of individual tiles or groups of tiles based on the cursor movement commands. The system further includes means for blocking or allowing viewing of television programs based on the overall program ratings and specific content ratings of the rows and columns corresponding to the highlighted tiles when a selection command is entered into the input.

**13 Claims, 26 Drawing Sheets**



**A29**

**US 6,701,523 B1**

Page 2

### U.S. PATENT DOCUMENTS

5,619,653 A  *  4/1997  Kawauchi  ................... 709/213
5,710,815 A  *  1/1998  Ming et al.  ................. 380/241
5,828,402 A   10/1998  Collings
5,969,748 A   10/1999  Casement et al.

5,973,683 A  *  10/1999  Cragun et al.  .............. 345/719
6,037,969 A  *  3/2000  Lim et al.  ................... 380/221
6,072,520 A   6/2000  Yuen et al.

* cited by examiner

A31



FIG. 1

U.S. Patent

Mar. 2, 2004

Sheet 1 of 26

US 6,701,523 B1

U.S. Patent

Mar. 2, 2004

Sheet 2 of 26

US 6,701,523 B1

**A32**

## FIG.2

U.S. Patent

Mar. 2, 2004

Sheet 3 of 26

US 6,701,523 B1

A33

# FIG.3



| PIP WINDOW | BLUE | GREEN | GUIDEPLUS+ |
| | HELP TEXT | | |
| | SORT | SCHEDULE | VCHIP+ | MESSAGES |
| TV AD WINDOW 1 | GLOBAL BLOCK/UNBLOCK<br>BY RATINGS<br>BY TIME<br>BY CHANNEL<br>BY TIME ALLOWANCE<br>BY $ ALLOWANCE | | |
| TV AD WINDOW 2 | | | |

U.S. Patent

Mar. 2, 2004

Sheet 4 of 26

US 6,701,523 B1

A34

## FIG.4

**A35**

## FIG.5

| | CHANGE | CLEAR | GUIDEPLUS+ |
|---|---|---|---|

| PIP WINDOW | HELP TEXT |
|---|---|

| | SORT | SCHEDULE | VCHIP+ | MESSAGES |
|---|---|---|---|---|

| | DEFAULT | USER | PASSWORD | CONFIRM |
|---|---|---|---|---|

**TV AD WINDOW 1**

```
        DEFAULT   USER           PASSWORD   CONFIRM
                  MASTER
           X      #1  KIDS
                  #2  BAM BAM
                  #3  PEBBLES
                  #4  WILMA
                  #5  FRED
                  #6
                  #7
                  #8
```

**TV AD WINDOW 2**

U.S. Patent

Mar. 2, 2004

Sheet 6 of 26

US 6,701,523 B1

A36

### FIG. 6

U.S. Patent

Mar. 2, 2004

Sheet 7 of 26

US 6,701,523 B1

*FIG.7*

U.S. Patent

Mar. 2, 2004

Sheet 8 of 26

US 6,701,523 B1

**A38**

## FIG.8



| BLUE | GREEN | GUIDEPLUS+ |

PIP WINDOW

V-CHIP PLUS+ HELP TEXT

| SORT | SCHEDULE | VCHIP+ | MESSAGES |

TV AD WINDOW 1

TV AD WINDOW 2

GLOBAL BLOCK/UNBLOCK
BY RATINGS
BY TIME
BY CHANNEL
BY TIME ALLOWANCE
BY $ ALLOWANCE
SET PASSWORDS

U.S. Patent

Mar. 2, 2004

Sheet 9 of 26

US 6,701,523 B1

**FIG.9**



| PIP WINDOW | BLUE | GREEN | GUIDEPLUS+ |
|---|---|---|---|
| | HELP TEXT | | |
| | SORT | SCHEDULE | VCHIP+ | MESSAGES |

TV AD WINDOW 1

TV AD WINDOW 2

GLOBAL BLOCK/UNBLOCK
BY RATINGS

BY CHANNEL
BY TIME ALLOWANCE
BY $ ALLOWANCE
SET PASSWORDS

A39

U.S. Patent

Mar. 2, 2004

Sheet 10 of 26

US 6,701,523 B1

A40

## FIG.10

U.S. Patent

Mar. 2, 2004

Sheet 11 of 26

US 6,701,523 B1

A41

## FIG.11



| PIP WINDOW | BLUE | GREEN | GUIDEPLUS+ |
| | V—CHIP PLUS+ HELP TEXT | | |
| | SORT | SCHEDULE | VCHIP+ | MESSAGES |
| TV AD WINDOW 1 | GLOBAL BLOCK/UNBLOCK | | |
| | BY RATINGS | | |
| | BY TIME | | |
| | BY CHANNEL | | |
| TV AD WINDOW 2 | BY TIME ALLOWANCE | | |
| | BY $ ALLOWANCE | | |
| | SET PASSWORDS | | |

U.S. Patent

Mar. 2, 2004

Sheet 12 of 26

US 6,701,523 B1

A42

## FIG.12



| PIP WINDOW | BLUE | GREEN | GUIDEPLUS+ |
|---|---|---|---|

HELP TEXT

| SORT | SCHEDULE | VCHIP+ | MESSAGES |

GLOBAL BLOCK/UNBLOCK
BY RATINGS
BY TIME

BY TIME ALLOWANCE
BY $ ALLOWANCE
SET PASSWORDS

TV AD WINDOW 1

TV AD WINDOW 2

U.S. Patent

Mar. 2, 2004

Sheet 13 of 26

US 6,701,523 B1

**A43**

## *FIG.13*



| PIP WINDOW | BLOCK | CLEAR | GUIDEPLUS+ |
|---|---|---|---|
| | | HELP TEXT | |
| | SORT | SCHEDULE | VCHIP+ | MESSAGES |

**FOR USER:**
**MASTER PASSWORD:**

#3 PEBBLES

```
TV AD WINDOW 1

MOVIES    ABC.5    PBS.2    CSPAN   HIST
SPORTS    ABC.5    PBS.11   CNN     HB01
CHILDREN  CBS.7    PBS.44   DISC    HB02
PPV       CBS.12   A&E              HB03
          FOX.25   SCIFI    E       HEADL
TV AD WINDOW 2
          FOX.13   BCL      ESPN    MTV
          NBC.7    BRAVO    FOOD    NICK
          NBC.14   TOON     HGTV    QVC
```

U.S. Patent

Mar. 2, 2004

Sheet 14 of 26

US 6,701,523 B1

A44

## FIG. 14



| PIP WINDOW | BLUE | GREEN | GUIDEPLUS+ |

V—CHIP PLUS+ HELP TEXT

| SORT | SCHEDULE | VCHIP+ | MESSAGES |

TV AD WINDOW 1

TV AD WINDOW 2

GLOBAL BLOCK/UNBLOCK
BY RATINGS
BY TIME
BY CHANNEL
BY TIME ALLOWANCE
BY $ ALLOWANCE
SET PASSWORDS

A45

## FIG.15

## FIG.16



| PIP WINDOW | ADD TIME | CLEAR | GUIDEPLUS+ |
|---|---|---|---|
| | HELP TEXT | | |

| | SORT | SCHEDULE | VCHIP+ | MESSAGES |

FOR USER:     #3 PEBBLES
MASTER PASSWORD:

WEEKLY    8 HRS.
MON    2 HRS.
TUES    2 HRS.
WED    2 HRS.
THURS    2 HRS.
FRI    2 HRS.
SAT    2 HRS.
SUN    2 HRS.

TV AD WINDOW 1

TV AD WINDOW 2

A46

U.S. Patent

Mar. 2, 2004

Sheet 17 of 26

US 6,701,523 B1

## FIG.17

| | BLUE | GREEN | GUIDEPLUS+ |
|---|---|---|---|
| PIP WINDOW | V−CHIP PLUS+ HELP TEXT | | |
| | SORT | SCHEDULE | VCHIP+ | MESSAGES |

TV AD WINDOW 1

TV AD WINDOW 2

GLOBAL BLOCK/UNBLOCK
BY RATINGS
BY TIME
BY CHANNEL
BY TIME ALLOWANCE
BY $ ALLOWANCE
SET PASSWORDS

U.S. Patent

Mar. 2, 2004

Sheet 18 of 26

US 6,701,523 B1

A48

## FIG.18

U.S. Patent

Mar. 2, 2004

Sheet 19 of 26

US 6,701,523 B1

A49

## FIG. 19

U.S. Patent

Mar. 2, 2004

Sheet 20 of 26

US 6,701,523 B1

A50

## FIG.20



| | BLUE | GREEN | GUIDEPLUS+ |
|---|---|---|---|

PIP WINDOW

V–CHIP PLUS+ HELP TEXT

| SORT | SCHEDULE | VCHIP+ | MESSAGES |
|---|---|---|---|

TV AD WINDOW 1

TV AD WINDOW 2

GLOBAL BLOCK/UNBLOCK
BY RATINGS
BY TIME
BY CHANNEL
BY TIME ALLOWANCE
BY $ ALLOWANCE
SET PASSWORDS

U.S. Patent

Mar. 2, 2004

Sheet 21 of 26

US 6,701,523 B1

A51

## FIG.21



| | BLUE | GREEN | GUIDEPLUS+ |
|---|---|---|---|
| PIP WINDOW | | HELP TEXT | |
| | SORT | SCHEDULE | VCHIP+ | MESSAGES |
| TV AD WINDOW 1 | | BY RATINGS<br>BY TIME<br>BY CHANNEL<br>BY TIME ALLOWANCE<br>BY $ ALLOWANCE<br>SET PASSWORDS | |
| TV AD WINDOW 2 | | | |

U.S. Patent

Mar. 2, 2004

Sheet 22 of 26

US 6,701,523 B1

**A52**

## FIG.22

U.S. Patent

Mar. 2, 2004

Sheet 23 of 26

US 6,701,523 B1

*FIG.23*



A53

U.S. Patent

Mar. 2, 2004

Sheet 24 of 26

US 6,701,523 B1

**A54**

## FIG.24A

U.S. Patent

Mar. 2, 2004

Sheet 25 of 26

US 6,701,523 B1

## FIG.24B

| PIP WINDOW | BLOCK | CLEAR | GUIDEPLUS+ |
|---|---|---|---|

HELP TEXT

| SORT | SCHEDULE | ///VCHIP/// | MESSAGES |

FOR USER: #1 KIDS
MASTER PASSWORD: ⟨_____⟩

| MPAA RATING CODE |
|---|
| G |
| PG |
| PG-13 |
| ///R/// |
| ///NR-17/// |
| ///UNRATED/// |

TV AD WINDOW 1

TV AD WINDOW 2

A55

U.S. Patent

Mar. 2, 2004

Sheet 26 of 26

US 6,701,523 B1

## FIG.25



| PIP WINDOW | BLOCK | CLEAR | GUIDEPLUS+ |

HELP TEXT

| SORT | SCHEDULE | VCHIP | MESSAGES |

FOR USER:        #1  KIDS
MASTER PASSWORD: ⟨_____⟩

ALL DAYS
WEEKENDS
WEEKDAYS
SCHOOL DAYS
MON
TUES
WED
THURS
FRI
SAT
SUN

FROM:  3:00 PM
TO:    6:00 PM

TV AD WINDOW 1

TV AD WINDOW 2

A56

US 6,701,523 B1

1

# V-CHIP PLUS+IN-GUIDE USER INTERFACE APPARATUS AND METHOD FOR PROGRAMMABLE BLOCKING OF TELEVISION AND OTHER VIEWABLE PROGRAMMING, SUCH AS FOR PARENTAL CONTROL OF A TELEVISION RECEIVER

## RELATED APPLICATIONS

This application claims priority in U.S. Provisional Application No. 60/100,575 filed Sep. 16, 1998. The disclosure of U.S. Provisional Application Nos. 60/100,575 and 60/085, 401 are incorporated herein by reference as if fully stated here.

## FIELD OF THE INVENTION

The present invention relates generally to television and other viewable programming systems, and more particularly, to an apparatus and method that provides an In-Guide user interface for programmable blocking of viewable programs, such as for parental control of a television receiver.

## BACKGROUND OF THE INVENTION

### The V-Chip System

A system has been proposed in the United States and endorsed by the U.S. Congress commonly known as the V-Chip System. The system involves using the vertical blanking interval ("VBI") of a standard television signal to include a code which indicates one or more rating factors for the program then being aired. These rating factors can include ratings similar to those promulgated by the Motion Picture Association of America (e.g. G, PG, PG-13, R, NC-17) and numerical ratings of individual categories of program nature such as violence, language, nudity and sexual content. A consumer V-Chip television system would allow a consumer to program his or her television system to exclude programs according to their preferred levels of one or more of these rating criteria or alternatively could be programmed to permit only programs having certain levels of content according to these rating categories.

A problem with the V-Chip system, as recognized in an article by T. Atherton, entitled "Living With the V-Chip," The Ottawa Citizen, Entertainment, Section F, pp. F1–F2 (Saturday, Mar. 9, 1996), is that the perceived utility of the V-Chip system to a consumer depends on whether the consumer agrees with the subjective ratings contained in the VBI for most, if not all, programs. The author of this article, who purportedly has been involved in a "Beta-test" of the V-Chip system in Canada, gives two illustrative examples in his article. First, "trash-talk" shows are rated at the lowest possible level for violence and the next lowest level for language and sex categories, even though these shows often contain verbal violence, physical confrontations and graphic verbal sexual discussions. Second, utilizing the overall rating system to exclude this type of program, such as excluding all programs with a rating above PG, results in the blocking out of many programs which the author considers appropriate for viewing and does not wish blocked out, such as the movie Forrest Gump. Although some people may disagree with the author's judgment of the relative harm and worth of particular television programs, the article illustrates, at least, that regardless of how much the ratings providers will be able to adjust and fine tune their ratings system, based upon the majority of consumers' wishes, there will remain a significant portion of the consumer public who

2

will disagree with the rating systems and think that whatever exclusion programming they do will block out desirable programs while not blocking out undesirable programs. Accordingly, improvements on the V-Chip system are needed. One improvement to the V-Chip system is using apparatus and method as described in co-pending U.S. Provisional Patent Application No. 60/076,290 filed on Feb. 27, 1998, titled V-Chip Plus: Parental Control Apparatus and Method, the disclosures of which are hereby incorporated by reference as if set forth in full herein.

### Picture-in-picture Display of Television Programs

For a number of years, television receivers have been equipped with picture-in-picture (PIP) capability. In PIP format, the moving, real time images of one television channel are displayed on the background of the screen and the moving, real time images of another television channel are displayed in a PIP window overlaid on a small area of the background. Because two channels are simultaneously displayed by the television receiver, two tuners are required. The viewer enters the PIP mode by pressing a PIP key on the viewer's controller. Then, the viewer can change either the channel of the background or the channel of the PIP by resetting the appropriate tuner. To reverse the background and PIP images, the viewer simply presses a SWAP key. To collapse the PIP window, the viewer again presses the PIP key.

### Electronic Television Guides

Television program guides help television viewers select programs to watch. Such television program guides list the available television programs by day of the week, time of day, channel, and program title (text-based television program guides). For many years, text-based television program guides have been published in hard copy form. More recently, as illustrated by Levine Pat. No. 4,908,713, text-based television program guides have begun to take an electronic form. In other words, the schedule of program listings is stored in an electronic memory connected to the television receiver. The program listings are recalled from memory by the viewer on command for display on the television screen. Without PIP technology, text-based television program guides overlay the real-time image of the program being received by the television tuner.

### Still Image Picture Augmentation of Text-Based Television Programs

Despite the prevalence of text-based television program guides, many viewers prefer to make their program selections by switching the television tuner from channel to channel in order to observe on the screen the program being received on the respective channels. This process is sometimes called "grazing."

Emanuel Pat. No. 5,161,019 discloses an automated form of channel grazing. A preselected group of channels are sequentially scanned by switching, the tuner of the television receiver from channel to channel. A still image of the program received on each channel is stored in a memory. After all the channels have been scanned, the still images from all of the channels are simultaneously displayed on the television screen. This process gives the viewer more information about the program choices in addition to that obtainable from a textual television program guide, namely still images of the actual programs are displayed.

### Simultaneous PIP Display of Real-Time Program Images and Electronic Television Program Schedule Guides

In one embodiment of the invention described in co-pending PCT Application PCT/US95/11173 for Method

US 6,701,523 B1

3

and Apparatus for Displaying Television Programs and Related Text, the disclosures of which are hereby incorporated by reference as if set forth in full herein, real-time images of a television program can be displayed in the PIP window. Simultaneously, a television viewer can use a PIP format for display of television program listings from a program schedule data base in the background. The viewer can select a particular program from the displayed current television program listing and cause the corresponding real-time program images to appear in the PIP window. In another embodiment of the invention described in co-pending PCT Application PCT/US95/11173, a television viewer can use a PIP format for display of future television program listings from a program schedule data base in the background and moving images of a video clip of one of the program listings in the background display selected for example by a cursor.

## SUMMARY OF THE INVENTION

The present invention is directed to an apparatus and method that provides for a user interface for programmable blocking, such as for parental control, of viewable programs, such as programs that can be viewed on a television receiver. A memory provides storage of information relating to viewable programming and user defined blocking instructions. A microprocessor generates a blocking command as a function of the information stored in memory. A blocking circuit, such as a blocking circuit which passes a baseband television video signal to a television display, provides the blocking of the video signal in response to the blocking command.

## DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. 1 is a schematic showing one embodiment of an apparatus according to the present invention with parental control circuitry embedded in a video cassette recorder;

FIG. 2 is a television screen in PIP format displaying password-based options of the V-Chip Plus+In-Guide User Interface Main Blocking Menu to block programs by Ratings/content codes, Time, Channel, Time Allowance, Pay-Per-View dollar Allowance and individual programs as selected from the program schedule grid guide or by inputting compressed codes such as a PlusCode™ which is a compressed code used by Gemstar Development Corporation's VCR Plus+® systems and which presently appear in television calendars and may be used to identify particular programs; FIG. 1 also displays the Global Block/Unblock option which may be used by the Master/Administrator to temporarily override blocking instruction to allow unblocked viewing and to then re-establish blocking instructions;

FIG. 3 is a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "Set Passwords" option;

FIG. 4 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "Set Password" interface screen and sample viewer-defined users;

FIG. 5 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "Set Password" interface screen and a sample viewer-defined password selection;

FIG. 6 is a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Menu of the "By Ratings" option;

4

FIG. 7 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By Ratings" interface screen and sample viewer-defined blocking selections;

FIG. 8 is a television screen in PIP format displaying confirmation that Ratings Blocking has been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Ratings" option;

FIG. 9 is a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Time" option:

FIG. 10 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By Time" interface screen and sample viewer-defined blocking selections;

FIG. 11 is a television screen in PIP format displaying confirmation that Time Blocking has been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Time" option;

FIG. 12 is a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Channel" option;

FIG. 13 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By Channel" interface screen and sample viewer-defined blocking selections;

FIG. 14 is a television screen in PIP format displaying confirmation that Channel Blocking has been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Channel" option;

FIG. 15 is a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Time Allowance" option;

FIG. 16 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By Time Allowance" interface screen and sample viewer-defined blocking selections;

FIG. 17 is a television screen in PIP format displaying confirmation that By Time Allowance Blocking has been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Time Allowance" option;

FIG. 18 is a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By $ Allowance" option;

FIG. 19 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By $ Allowance" interface screen and sample viewer-defined blocking selections;

FIG. 20 is a television screen in PIP format displaying confirmation that By $ Allowance Blocking has been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By $ Allowance" option;

FIG. 21 is a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "Global Block/Unblock" option;

FIG. 22 is a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "Global Block/ Unblock" interface screen and sample viewer input of user identification and password;

FIG. 23 is a television screen in PIP format displaying a sample V-Chip Plus+In-Guide User Interface Main Blocking Menu format that will appear after any Time Allowance or $ Allowance blocking has been set;

FIG. 24a is a television screen in PIP format displaying an alternative embodiment of the V-Chip Plus+In-Guide User

US 6,701,523 B1

5

Interface "By Ratings" interface screen for TV Ratings Codes and Content Codes in grid format with sample viewer-defined blocking selections;

FIG. 24*b* is a television screen in PIP format displaying an alternative embodiment of the V-Chip Plus+In-Guide User Interface "By Ratings" interface screen for MPAA Ratings Codes in grid format with sample viewer-defined blocking selections; and

FIG. 25 is a television screen in PIP format displaying an alternative embodiment of the V-Chip Plus+In-Guide User Interface "By Time" interface screen and sample viewer-defined blocking selections.

The accompanying drawings are in color. Color is used in the Detailed Description of the Invention to describe certain features of the invention; the description of color-designated features corresponds to the accompanying drawings. The colored drawings and the color-corresponding description is used as a method of description of a particular embodiment of the present invention. The present invention is not limited by the particular colors used herein to describe the invention.

DETAILED DESCRIPTION OF THE INVENTION

One embodiment of the present invention uses PIP display formatting to provide a password-protected programmable viewer interface to block or enable television program viewing, such as for parental control of television viewing. A parental control system is described in U.S. Pat. No. 5,382,983, which is hereby incorporated he reference as if set forth in full herein. Such parental control systems include circuitry for providing parental control of the use of a television receiver. As shown in FIG. 1, the circuitry is generally embedded within a VCR **50** connected between a television signal input **52** and a television monitor or display **54**. The parental control circuitry may be controlled by an input or remote controller **56** sending a command signal **58** to the circuitry to permit the user to select either by inclusion or exclusion the particular source and/or programs, channels, dates and times available for television viewing. Co-pending U.S. Provisional Patent Application titled V-Chip Plus: Parental Control Apparatus and Method, the disclosures of which have been previously incorporated by reference as if set forth in full herein, describes a preferred embodiment of the invention disclosed therein as allowing the viewer consumer to override the operation of the V-Chip system or particular programs contained in consumer programmable enable-over-ride lists and blocking-over-ride lists.

The present invention is not limited to the PIP television display format environment. The present invention applies equally to all devices that display viewable programming electronically, including but not limited to devices such as television, digital television, PCTV's, and PC's. Furthermore, the present invention applies equally to all viewable electronic programming display formats, including, but not limited to: display formats that provide partial or complete overlay menus; display formats that allow icons to be displayed on the screen to allow for selection of multiple functions, such as program viewing blocking/enablement, to be simultaneously displayed on the television screen; and display formats that allow the viewer to move the location of the viewing window for the program viewing blocking/enablement selection menus.

Still further, the present invention applies to all viewable programming delivery systems and media, including but not limited to conventional television broadcast, cable

6

television, satellite television, the Internet, the World Wide Web, and all other electronic Ad information networks and electronic viewable programming delivery systems.

Selection of options, functions, actions, programs, channels, logos and all other selection criteria in this invention applies equally to all methods of selection whether by a television viewer's remote control device, by keyboard, by voice activation, by speech recognition, by motion activation, by motion recognition, by mouse, by trac-ball, by touch pad, and/or by all other cursor-control devices.

One embodiment of the present invention allows the viewer, while simultaneously viewing real time television programming, to block, or enable, program viewing using password-based category blocking selection criteria including Global blocking/unblocking, and blocking By Ratings, By Time, By Channel, By Time Allowance, and By $ Allowance. "By Grid Guide Selection" blocking allows the viewer to view real time images of simultaneously broadcast programs, and to view video and sound clips of future programs, listed in an electronic program schedule guide and to set blocking/enablement instructions for individual programs, by channel, and/or by time slot.

After the viewer has selected, as described below, the television program viewing blocking/enablement function ("V-ChipPlus+"), the viewer's screen displays the V-Chip Plus +In-Guide User Interface Main Blocking Menu (the "Main Blocking Menu"). FIG. 1 shows a V-Chip Plus+In-Guide User Interface Main Blocking Menu to block programs by Ratings/content codes, Time, Channel, Time Allowance, Pay-Per-View dollar Allowance and individual programs as selected from the program schedule grid guide or by inputting compressed codes such as a PlusCode™ which is a compressed code used by Gemstar Development Corporation's VCRPlus+® systems and which presently appear in television calendars and may be used to identify particular programs. FIG. 1 also displays the Global Block/Unblock option which may be used by the Master/Administrator to temporarily override blocking instruction to allow unblocked viewing and to then re-establish blocking instructions. The Main Blocking Menu further provides for viewer selection of the Set Passwords option.

The viewer can enter the Main Blocking Menu in a number of ways. One embodiment is that the viewer, at some point in time after turning on the viewer's television receiver, presses a dedicated key on a remote control device. In another embodiment, the viewer enters the Main Blocking Menu by selecting the Blocking Option from the GuidePlus+Grid Guide option bar, causing the Main Blocking Menu to be displayed in the background window of the PIP display (the "PIP embodiment"). The PIP embodiment is reflected throughout the figures to this patent application. If "By Time Allowance" and/or "By $ Allowance" blocking instructions have been set, the Main Blocking Menu will appear when the viewing device, such as a television, is turned on.

In other embodiments, the viewer could enter the Main Blocking Menu in other ways, including but not limited to: 1.) The viewer presses a menu key on the viewer's remote control device that would enter a selection menu for various programming features for the viewer's particular viewing device, such as a television. Program view blocking/enablement would be an option on the viewing device's selection general menu. The viewer could then select program view blocking/enablement from the general menu; 2.) The viewer selects a program viewing blocking/enablement icon on the viewer's viewing device screen by, for instance,

**A59**

US 6,701,523 B1

7

moving a cursor to the location of the icon and indicating selection of the program viewing blocking/enablement function.

In another embodiment, the viewer can enter the "Blocking Mode" while in the TV Guide Plus+Grid Guide (the "Grid Guide embodiment") or similar electronic program viewing scheduling guide (the "Grid Guide"). Co-pending U.S. Provisional Patent Application Serial No. 60/053/330, titled EPG with Advertising Messages, the disclosures of which are hereby incorporated by reference as if set forth in full herein, describes as grid guide 22 such an electronic program viewing scheduling guide. In the Grid Guide embodiment, the viewer enters the "Blocking Mode" by selecting the Blocking Mode function, from for instance, the option bar of the Grid Guide.

In another embodiment, the viewer would enter Plus-Code™ numbers of programs to be blocked.

From the Main Blocking Menu, the viewer can select from options that allow the viewer to block or enable viewing of programs globally, or to block or enable viewing of programs by Ratings/content codes, Time, Channel, Time Allowance, Pay-Per-View dollar Allowance and By Grid Guide Selection from an electronic television program schedule grid guide. Once the viewer has set blocking instructions, the blocking instruction database is updated and is accessed by a program viewing blocking system, such as is claimed in co-pending U.S. Provisional Patent Application No. 60/076,290 filed Feb. 27, 1998, titled V-Chip Plus: Parental Control Apparatus and Method, the disclosures of which have been previously incorporated by reference as if set forth in full herein. The program viewing blocking system uses the database program viewing blocking instructions to block a particular user from viewing programs as directed by the blocking instructions.

In one embodiment, the viewer selects a particular option from the Main Blocking Menu by using the arrow keys on the viewer's remote control device to move the highlight bar up or down the Main Blocking Menu selections and by pressing an Enter key, or some other similarly functional key, to select the highlighted option.

Setting User-level Passwords

V-Chip Plus+provides password-based options to block programs by Ratings/content codes, Time, Channel, Time Allowance, $ Allowance, and by individual program as selected from a program schedule. FIG. 2 shows a television screen in PIP embodiment format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "Set Passwords" option. Turning to FIG. 3, a television screen is shown in PIP format displaying the V-Chip Plus+In-Guide User Interface "Set Password" interface screen and sample viewer-defined users. An alphanumeric password with a plurality of numeric digits may be set up for a plurality of users.

Viewer names can be input by highlighting a "User" tile in the Set Password interface screen. The "user" tiles in FIG. 2 are shown as blue tiles. The viewer can then input the user name by pressing the Blue "Alpha" button on the Guide Plus+display bar and by then using the up/down arrow keys on the viewer's remote control device to scroll up and down the pull down alphabet menu and selecting the appropriate alphabetic characters. In this manner, the viewer selects the alphabetic characters comprising each viewer's name. To designate another viewer's name, the viewer uses the up/down arrow keys on the viewer's remote control device to highlight another blue "User" tile.

8

In the PIP embodiment, the viewer inputs a password for each "User" using the digit keys of the viewer's remote control device and/or the scroll down alphabet menu described above. FIG. 4 shows a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "Set Password" interface screen. FIG. 4 shows a sample viewer-defined password selection. A password is not set until the viewer types the password a second time in the Confirm tile for the user specified.

The viewer with the most restrictive Ratings/content settings is automatically set as the default. The default viewer's settings will be used when the television is turned on after the viewer has input the settings.

There may be more than one Master viewer. There may be more than one Administrator viewer. One embodiment of the invention would recognize a hierarchy of viewers. The hierarchy would allow a Master viewer to set blocking instructions for all viewers. The hierarch would allow an Administrator viewer to set blocking instructions for all viewers at a hierarchical level below that of the setting Administrator. Only the viewer designated as a Master or Administrator viewer will have the capability to use the Global Block/Unblock function. In one embodiment, only the highest ranking Master viewer would be allowed the capability to use the Global Block/Unblock function.

Once the viewer completes entering "User" names and passwords, the viewer must press the Blue action "Finished" button on the Guide Plus+screen bar to enter the alpha name into the password database. User names and passwords are not entered into the viewer database until the viewer selects the Blue action "Finished" button. The viewer can select the Blue action "Finished" button after entering each name and after confirming each password. Alternatively, the viewer may enter a plurality of names and passwords before selecting the Blue action "Finished" button. Alternatively, the viewer can press the Green action button to clear the password or alphabetic name inputs so that the viewer can begin inputting the user/password information again. The viewer that is designated as the "Master/Administrator" can turn global settings on or off.

Once the viewer has completed entering "User" names and passwords, the viewer can return to the Main Blocking Menu by using the up/down arrow keys to highlight V-CHIP+on the menu bar.

Blocking from the Grid Guide

In one embodiment, the viewer enters the Grid Guide to identify particular programs to be blocked at the user level. Once in the Grid Guide, the viewer would enter the Blocking Mode by, for example, using the viewer's remote control device to select a Block/Unblock action button on the Grid Guide. Once in the Grid Guide Blocking Mode, the Master/ Administrator would navigate through the schedule of programs as provided by the Grid Guide system, such as using the up/down and left/right arrow keys on the viewer's remote control device.

Real time images of real time programs highlighted by the viewer in the Grid Guide will be shown in the PIP or other window of the television screen. Co-pending PCT Application PCT/US95/11173 for Method and Apparatus for Displaying Television Programs and Related Text, the disclosures of which have been previously incorporated by reference as if set forth in full herein, describes one embodiment that provides for the display of real-time images of a television program in the PIP window while simultaneously providing that the television viewer can use a PIP format for

**A60**

9

display of television program listings from a program schedule data base in the background. The viewer can select a particular program from the displayed current television program listing and cause the corresponding real-time program images to appear in the PIP window.

Video and sound clips of future-scheduled programs highlighted by the viewer in the Grid Guide will be shown in the PIP or other window of the television screen. Co-pending PCT Application PCT/US95/11173, the disclosures of which have been previously incorporated by reference as if set forth in full herein, describes as one embodiment the use by a television viewer of a PIP format for display of future television program listings from a program schedule data base in the background and moving images of a video clip of one of the program listings in the background display selected, for example, by a cursor.

The viewer selects a particular program, channel logo, or time slot to be blocked by one selection method, for instance, using the viewer's remote control device to point to and select a program, channel or time slot. The viewer's selection would be reflected by color coding or other highlighting method.

Then, the viewer sets instructions to block the particular program, channel logo, and/or time slot, using, for instance, the viewer's remote control device to select a blocking action button on the Grid Guide. Pressing the Blue action button will block viewing of the highlighted program. When blocking a particular program, the viewer could further select another action to request the following blocking options: 1.) block a particular episode of a program by title for all occurrences of that program on a particular day for all channels and all times ("Daily Blocking"); 2.) block all occurrences of that program by title for the week for all channels and all time slots ("Weekly Blocking"); 3.) block all occurrences of that program by title for all channels and all time slots ("All Blocking"); and/or 4.) block a particular channel at a particular time slot.

In a Grid Guide embodiment of the present invention, the Grid Guide would show the program title and rating and/or content information.

### Ratings or Content Code Blocking

The "Master/Administrator" user/viewer can block a selected user's access by ratings or content codes. FIG. 5 shows a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Ratings" option.

After entering the "By Ratings" interface screen, the Master/Administrator selects a user from the user pull down menu. The user pull down menu lists all of the users entered in the user database. The Master/Administrator uses the up/down arrow keys on the Master/Administrator's remote control device to scroll up and down the user pull down menu. The Master/Administrator selects a particular user's name. The Master/Administrator must then enter the appropriate password for the Master/Administrator. When the password is accepted, the password tile turns green. Password acceptance is required to allow the Master/Administrator access to the Rating/Content tiles.

The Master/Administrator then uses the up/down arrow keys to scroll through the various Rating and Content codes. The Rating or Content code tile that can be selected is the tile that is highlighted in blue. The V-Chip Help Text portion of the Guide Plus+screen provides help explanations for the feature currently highlighted by the remote control selection. The V-Chip Help Text provides an explanation of each Rating or Content code as the Rating or Content code tile is highlighted.

10

The Master/Administrator presses the Blue action button on the Guide Plus+task bar to select a particular Rating or Content code to be blocked. When the Master/Administrator selects a particular Rating or Content code to be blocked, the tile for that particular code turns red. If the Master/Administrator wants to enable a blocked Rating or Content code, the Master/Administrator selects that particular Rating or Content code and presses the Blue action button on the Guide Plus+task bar, which will return the tile for the particular Rating or Content code to green. FIG. 6 shows a television screen in PIP format displaying the V-Chip Plus+ In-Guide User Interface "By Ratings" interface screen and sample viewer-defined blocking selections. FIG. 6 also demonstrates the Help Text explanation for the highlighted Rating code, "NC-17." Pressing the Green action button on the Guide Plus+Task Bar clears all settings on this screen.

An alternative embodiment of the "By Ratings" interface is represented in FIGS. 23a and 23b. FIG. 23a demonstrates the use of a "By Ratings" grid for TV ratings codes and content codes. FIG. 23b demonstrates the use a "By Ratings" interface for MPAA Ratings Codes.

In FIG. 23a, all possible TV Ratings Codes ("TV-Y", "TV-Y7", etc.) are listed, in this case, on the left side of the grid 110. Alternatively, MPAA Rating codes, other rating codes or combinations of different rating codes, such as MPAA and TV Ratings Codes may be used in the place of just TV Ratings Codes. Also listed is a grid row for "Unrated" programs 112. That is, the Master/Administrator can chose to block all programs that are not rated. All possible TV Content Codes, ("S" for Sex, "V" for Violence, "L" for Language, etc.) or a subset thereof are listed, in this case, across the top of the grid 114. Each grid tile represents a particular combination of a TV Ratings Code and a TV Content Code. The Master/Administrator uses the up/down and left/right arrow keys on the viewer's remote control device to highlight a grid tile. When the appropriate grid tile is highlighted, the Master/Administrator presses the Blue action button on the Guide Plus+task bar to select that particular Rating/Content grid tile to be blocked. When the Master/Administrator selects a particular Rating/Content Code grid tile to be blocked, the grid tile for that particular code turns red, or some other color to indicate selection of that tile. In FIG. 23a, tiles 100 and 102 have been highlighted, selected and turned red (or some other color) to indicate they have been selected. Thereafter, programs that are rated TV-PG and have either L or V content codes will be blocked.

In addition to selecting individual tiles, entire rows or columns are highlighted for possible selection by moving the highlighted tile with the up/down and left/right arrow keys on the viewer's remote control device to the header row 114 or header (first) column 110. Thus, entire TV Ratings Codes rows or entire TV Content Codes can be selected with on press of the Blue action button.

If the Master/Administrator wants to enable a blocked Rating/Content grid tile, the Master/Administrator selects that particular Rating or Content Code grid tile and presses the Blue action button on the Guide Plus+task bar, which will return the grid tile for the particular Rating/ Content Code tile to green.

If the uppermost, leftmost tile is highlighted, the entire grid of tiles can be selected by one press of the Blue action button. This selection allows the Master/Administrator to select the tiles that the Master/Administrator wants to allow rather than selecting the tiles that the Master/Administrator want to block.

US 6,701,523 B1

11

Currently, TV Content codes do not apply to MPAA Rating Codes. Accordingly, FIG. 23*b* demonstrates that the Master/Administrator can chose any of the MPAA Rating Code grid tiles to select that Rating Code for blocking/ enablement. As with FIG. 23*a*, FIG. 23*b* provides a grid tile to block/enable unrated programs.

The Master/Administrator can then select another user name and set Ratings and Content code blocking and/or enablement instructions for each user subsequently selected. Changes are accepted when the Master/Administrator leaves the "By Ratings" interface screen by returning to the Main Blocking Menu.

Once the viewer has completed entering "By Rating" blocking and/or enablement instructions, the viewer can return to the Main Blocking Menu by using the up/down arrow keys to highlight V-CHIP+ on the menu bar. The "By Ratings" tile on the Main Blocking Menu will be RED, indicating that Ratings Blocking instructions have been set. FIG. 7 shows a television screen in PIP format displaying confirmation that Ratings Blocking instructions have been set by RED highlighting on the V-Chip Plus +In-Guide User Interface Main Blocking Menu of the "By Ratings" option.

"By Time" Blocking

The Master/Administrator can set user-level instructions to block program viewing for particular time ranges, for particular days of the week, or for "All Days." FIG. 8 shows a television screen in PIP format displaying a viewer selection from the V-Clip Plus+In-Guide User Interface Main Blocking Menu of the "By Time" option. By selecting the "By Time" option, the user enters the "By Time" interface screen. FIG. 9 shows a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By Time" interface screen and sample viewer-defined blocking selections.

In the "By Time" interface screen, the Master/ Administrator selects a user from the user pull down menu. The user pull down menu lists all of the users entered in the user database. The Master/Administrator uses the up/down arrow keys on the Master/Administrator's remote control device to scroll up and down the user pull down menu. The Master/Administrator selects a particular user's name. The Master/Administrator must then enter the appropriate password for the Master/Administrator. When the password is accepted, the password tile turns green. Password acceptance is required to allow the Master/Administrator access to the Day of the Week and time range tiles.

In the "By Time" interface screen, the Master/ Administrator uses the up/down arrow keys to scroll through the various days of the week, or to select the "All Days" feature: The Master/Administrator can then enter time range blocking instructions for the particular day of the week, or for "All Days." The Master/Administrator enters time ranges using the numeric keys on the Master/ Administrator's remote control device. The Master/ Administrator then selects the am/pm tile and uses the Blue action button on the Guide Plus+task bar to select a.m. or p.m. designation for the identified time range. After the Master/Administrator sets blocking instructions for a time range for a particular day, that day (or the "All Days") tile turns RED. Pressing the Green action button on the Guide Plus+task bar clears all setting on this screen. The V-Chip Help Text portion of the Guide Plus+screen provides help explanations for the feature currently highlighted by the remote control selection.

The Master/Administrator can then select another user name and set Time blocking and/or enablement instructions

12

for each user subsequently selected. Changes are accepted when the Master/Administrator leaves the "By Time" interface screen by returning to the Main Blocking Menu.

Once the viewer has completed entering "By Time" blocking and/or enablement instructions, the viewer can return to the Main Blocking Menu by using the up/down arrow keys to highlight V-CHIP+ on the menu bar. The "By Time" tile on the Main Blocking Menu will be RED, indicating that Time Blocking instructions have been set. FIG. 10 shows a television screen in PIP format displaying confirmation that Time Blocking has been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Time" option.

FIG. 24 is a television screen in PIP format displaying an alternative embodiment of the V-Chip Plus+In-Guide User Interface "By Time" interface screen and sample viewer-defined blocking selections. FIG. 24 provides for the designation by the Master/Administrator of time-sensitive categories such as "School Days," "Weekdays," "Weekends" and/or particular days of the week As an example of"School Day" blocking, if the Master/Administrator blocks the time frame from 8 pm to 7 am of a School Day, then the designated time frame is blocked for Sunday through Thursday. On the other hand, if the Master/Administrator blocks the time frame from 3 pm through 6 pm for School Days, then the designated time frame is blocked for Monday through Thursday. As an example of "Weekend" blocking, if the Master/Administrator blocks the time frame from 6 am through 8 am for Weekends, then the designated time frame is blocked for Saturday and Sunday. If the time frame from 6 pm through 7 pm is blocked for Weekends, then the designated time frame for Friday, Saturday and Sunday would be blocked. The Master/Administrator can further designate blocking for Weekdays (Monday through Friday). Further, a "Saturday/Sunday" option may be offered as an alternative the to the "Weekend" time frame where the "Weekend" time frame generally tracks and is the opposite of the "School Days" time periods. Of course, it is possible to have "School Days" and "Weekends" delineated so that they overlap in some areas while neither cover other specific time periods. Further, "School Days" may further be split into "School Days" and "School Nights," where "School Days" generally refers to Monday–Friday days, while "School Nights" generally refers to Sunday-Thursday nights.

The use of "School Days" (or "School Days" and "School Nights") and "Weekdays" also applies equally to the TV allowance embodiment described above in addition to the blocking functions.

In an alternative embodiment, Holidays, such as national or state holidays, are included in the "Weekend" and "School Days" groupings. Thus, in the United States, the Sunday night before Memorial Day (last Monday in May) would not be part of "School Days" when it otherwise would be. The list of Holidays that would affect the "School Days" and "Weekend" groupings is included into the system by any known data delivery method, including, but not limited to, being included in a factory installed memory, being downloaded over the VBI, a radio signal or other transmission, being downloaded from the Internet or other computer network and being keyed in by the Master/Administrator.

In another alternative embodiment, the School Days/ Weekend, or any other generic time periods are combined with other search criteria to search an electronic program guide (EPG) of the type disclosed in PCT Application PCT/US95/11173. Thus, a theme search for "Educational

A62

US 6,701,523 B1

13

shows" might be restricted to "School Days" where a theme search for "Cartoons" may be restricted to "Weekends."

In another alternative embodiment, the Master/Administrator can choose to block according to Weekend, Weekdays, or specific days of the week. In this embodiment, the Weekend category is defined to be Saturday and Sunday; Weekdays are defined to be Monday through Friday. In this alternative embodiment, neither the Weekend nor the Weekday categories are time-sensitive.

"By Channel" Blocking

The Master/Administrator can set user-level instructions to block program viewing for particular channels, for a group of channels by category, or for a group of shows by "Theme." FIG. 11 shows a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Channel" option.

By selecting the "By Channel" option, the user enters the "By Channel" interface screen. FIG. 12 shows a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By Channel" interface screen and sample viewer-defined blocking selections.

In the "By Channel" interface screen, the Master/Administrator selects a user from the user pull down menu. The user pull down menu lists all of the users entered in the user database. The Master/Administrator uses the up/down arrow keys on the Master/Administrator's remote control device to scroll up and down the user pull down menu. The Master/Administrator selects a particular user's name. The Master/Administrator must then enter the appropriate password for the Master/Administrator. When the password is accepted, the password tile turns green. Password acceptance is required to allow the Master/Administrator access to the Channel and Theme tiles.

In the "By Channel" interface screen, the Master/Administrator uses the up/down and left/right arrow keys to scroll through the various channels and "Themes." The Master/Administrator uses the Blue action button on the Guide Plus+task bar to select each channel or Theme to be blocked, or enabled. The tile for a blocked channel or Theme turns RED. The tile for an enabled channel or Theme turns Green. Pressing the Green action button on the Guide Plus+task bar clears all settings on this screen. Data for blocked channels will be stored in memory so it may be viewed if a channel is unblocked. The V-Chip Help Text portion of the Guide Plus+screen provides help explanations for the feature currently highlighted by the remote control selection.

The Master/Administrator can then select another user name and set Channel or Theme blocking and/or enablement instructions for each user subsequently selected. Changes are accepted when the Master/Administrator leaves the "By Channel" interface screen by returning to the Main Blocking Menu.

Once the viewer has completed entering "By Channel" blocking and/or enablement instructions, the viewer can return to the Main Blocking Menu by using the up/down arrow keys to highlight V-CHIP+ on the menu bar. The "By Channel" tile on the Main Blocking Menu will be RED, indicating that Channel and/or Theme Blocking instructions have been set. Turning to FIG. 13, a television screen is shown in PIP format displaying confirmation that Channel Blocking has been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Channel" option.

14

"By Time Allowances" Blocking

The Master/Administrator can set user-level viewing time allowances for each user by day of the week or for an entire week. Television viewing will be blocked if the daily viewing time by the viewing user exceeds the time allowance for the particular day of the week for that user. Television viewing will be blocked if the summation of the daily viewing time by the viewing user exceeds the weekly time allowance for that user. FIG. 14 shows a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Time Allowance" option.

By selecting the "By Time Allowance" option, the user enters the "By Time Allowance" interface screen. FIG. 15 shows a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By Time Allowance" interface screen and sample viewer-defined blocking selections.

In the "By Time Allowance" interface screen, the Master/Administrator selects a user from the user pull down menu. The user pull down menu lists all of the users entered in the user database. The Master/Administrator uses the up/down arrow keys on the Master/Administrator's remote control device to scroll up and down the user pull down menu. The Master/Administrator selects a particular user's name. The Master/Administrator must then enter the appropriate password for the Master/Administrator. When the password is accepted, the password tile turns green. Password acceptance is required to allow the Master/Administrator access to the Time Allowance tiles.

In the "By Time Allowance" interface screen, the Master/Administrator uses the up/down and left/right arrow keys to scroll through the various days of the week and to set time allowances for the particular days and for the entire week. The Master/Administrator uses the Blue action button on the Guide Plus+task bar to select each day of the week, or the entire week, for which a time allowance is to be set. The Master/Administrator presses the Blue action button on the Guide Plus+task bar to allow input of time allowance. Time allowance is then entered using the numeric keys of the Master/Administrator's remote control device. The Master/Administrator can press the Blue action button on the Guide Plus+task bar to add ½ hour increments, with each subsequent press of the Blue action button. The tile for a day or for the week with a time allowance turns RED. Pressing the Green action button on the Guide Plus+task bar clears all settings on this screen. The daily allowances can sum to a higher number than the total weekly allowance. Once the weekly allowance is reached by the viewing user, television viewing will be blocked for that user for the rest of the week even if the daily allowance for a particular day has not been exceeded. The V-Chip Help Text portion of the Guide Plus+screen provides help explanations for the feature currently highlighted by the remote control selection.

The Master/Administrator can then select another user name and set time allowances for each user subsequently selected. Changes are accepted when the Master/Administrator leaves the "By Time Allowance" interface screen by returning to the Main Blocking Menu.

Once the viewer has completed entering user-level "Time Allowances," the viewer can return to the Main Blocking Menu by using the up/down arrow keys to highlight V-CHIP+ on the menu bar. The "By Time Allowance" tile on the Main Blocking Menu will be RED, indicating that Time Allowances have been set. FIG. 16 shows a television screen in PIP format displaying confirmation that Time Allowances

US 6,701,523 B1

15

have been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By Time Allowance" option.

### "By $ Allowance" Blocking

The Master/Administrator can set user-level Pay-Per-View viewing dollar ("$") allowances for each user by day of the week or for an entire week. Television viewing will be blocked if the daily viewing dollar amount by the viewing user meets or exceeds the dollar allowance for the particular day of the week for that user. Television viewing will be blocked if the summation of the daily viewing dollar allowance by the viewing user meets or exceeds the weekly dollar allowance for that user. FIG. 17 shows a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By $ Allowance" option.

By selecting the "By $ Allowance" option, the user enters the "By $ Allowance" interface screen. FIG. 18 shows a television screen in PIP format displaying the V-Chip Plus+In-Guide User Interface "By $ Allowance" interface screen and sample viewer-defined blocking selections.

In the "By $ Allowance" interface screen, the Master/Administrator selects a user from the user pull down menu. The user pull down menu lists all of the users entered in the user database. The Master/Administrator uses the up/down arrow keys on the Master/Administrator's remote control device to scroll up and down the user pull down menu. The Master/Administrator selects a particular user's name. The Master/Administrator must then enter the appropriate password for the Master/Administrator. When the password is accepted, the password tile turns green. Password acceptance is required to allow the Master/Administrator access to the $ Allowance tiles.

In the "By $ Allowance" interface screen, the Master/Administrator uses the up/down and left/right arrow keys to scroll through the various days of the week and to set $ allowances for the particular days and for the entire week. The Master/Administrator uses the Blue action button on the Guide Plus+task bar to select each day of the week, or the entire week, for which a $ allowance is to be set. The Master/Administrator presses the Blue action button on the Guide Plus+task bar to allow input of $ allowance limitations. Dollar allowance is then entered using the numeric keys of the Master/Administrator's remote control device. The Master/Administrator can press the Blue action button on the Guide Plus+task A bar to add 50 cent increments, with each subsequent press of the Blue action button. The tile for a day or for the week with a $ allowance turns RED. Pressing the Green action button on the Guide Plus+task bar clears all settings on this screen. The daily allowances can sum to a higher amount than the total weekly allowance. Once the weekly $ allowance is reached by the viewing user, Paid-Per-View television viewing will be blocked for that user for the rest of the week even if the daily $ allowance for a particular day has not been met or exceeded. The V-Chip Help Text portion of the Guide Plus+screen provides help explanations for the feature currently highlighted by the remote control selection.

The Master/Administrator can then select another user name and set $ allowances for each user subsequently selected. Changes are accepted when the Master/Administrator leaves the "By $ Allowance" interface screen by returning to the Main Blocking Menu.

Once the viewer has completed entering user-level "$ Allowances," the viewer can return to the Main Blocking

16

Menu by using the up/down arrow keys to highlight V-CHIP+on the menu bar. The "By $ Allowance" tile on the Main Blocking Menu will be RED, indicating that $ Allowances have been set. FIG. 19 shows a television screen in PIP format displaying confirmation that $ Allowances have been set by RED highlighting on the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "By $ Allowance" option.

### Global Block/Unblock

The Master/Administrator, and only the Master/Administrator, can use the Global Block/Unblock instruction. FIG. 20 shows a television screen in PIP format displaying a viewer selection from the V-Chip Plus+In-Guide User Interface Main Blocking Menu of the "Global Block/Unblock" option. Turning to FIG. 21, a television screen is shown in PIP format displaying the V-Chip Plus+In-Guide User Interface "Global Block/Unblock" interface screen and sample viewer input of user identification and password. In the "Global Block/Unblock" interface screen, the Master/Administrator is prompted for the Master/Administrator's password. Acceptance of the password allows the Master/Administrator to use the Global Block/Unblock instruction. Global Block/Unblock is a toggle switch override command that allows the Master/Administrator to temporarily override all blocking instructions. Using the Global Block/Unblock command does not destroy all of the blocking instructions. The blocking instructions remain in memory. The Master/Administrator can globally unblock all previously set instructions to view programming without any blocking. The Master/Administrator can then globally reset all blocking instructions.

### Time and $ Allowance Accumulation and Blocking

Turning to FIG. 22, a television screen is shown in PIP format displaying a sample V-Chip Plus+In-Guide User Interface Main Blocking Menu format that will appear after any Time Allowance or $ Allowance blocking has been set. This screen will automatically appear each time that the television is turned on. The screen prompts the viewer for the viewer's "User" identification and for that "User's" password.

The time that the television is viewed by that user is then accumulated. Accumulated viewing times are compared at periodic time intervals to the time allowances set for that user. If the user's accumulated viewing time meets or exceeds the time allowance for that day, or for the week, the V-Chip Plus+In-Guide User Interface system sends blocking instructions to a program viewing blocking system, such as is claimed in co-pending U.S. Provisional Patent Application Ser. No. 60/076,290 titled V-Chip Plus: Parental Control Apparatus and Method, the disclosures of which have been previously incorporated by reference as if set forth in full herein, to block that user from further viewing.

Pay-Per-View dollar amounts agreed to by that user are accumulated. Accumulated Pay-Per-View dollar amounts agreed to by that user are then compared to that user's $ Allowances, by day, and for the week. The $ amount comparison is made each time that the user attempts to select a Pay-Per-View program. If the user's $ Allowance has been met or exceeded, the V-Chip Plus+In-Guide User Interface system sends blocking instructions to a program viewing blocking system, such as is claimed in co-pending U.S. Provisional Patent Application Ser. No. 60/076,290 titled V-Chip Plus: Parental Control Apparatus and Method, the

US 6,701,523 B1

17

disclosures of which have been previously incorporated by reference as if set forth in full herein, to block that user from further viewing.

## Illustrative Embodiments

The embodiments of the invention described herein are only considered to be preferred and/or illustrative of the inventive concept; the scope of the invention is not to be restricted to such embodiments. Various and numerous other arrangements may be devised by one skilled in the art without departing from the spirit and scope of this invention. For example, a variety of different on screen display color schemes can be used to communicate various selections and options to the viewer/user.

What is claimed is:

1. A system for restricting access to television programs comprising:

an input for accepting cursor movement and selection commands;

a display that depicts a two dimensional matrix composed of rows and columns of tiles, wherein either the rows of tiles or the columns of tiles correspond to overall program ratings and either the rows of tiles or the columns of tiles correspond to specific program content indications and depicts highlighting of individual tiles or groups of tiles based on the cursor movement commands; and

means for blocking or allowing viewing of television programs based on the overall program ratings and specific content ratings of the rows and columns corresponding to the highlighted tiles when a selection command is entered into the input.

2. The system of claim 1 wherein the overall program ratings comprise one or more of group of TV-Y, TV-Y7, TV-G, TV-PG, TV-14, TV-MA, G, PG, PG-13, R, NC-17 and X.

3. The system of claim 2 wherein the specific program content indication comprises one or more of the group of L, language, V, violence, MV, mild violence, FV, fantasy violence, BN, brief nudity, N, nudity, S, sexual content, AS, adult situations, D, and suggestive dialog.

4. The system of claim 1 wherein the specific program content indication comprises one or more of the group of L, language, V, violence, MV, mild violence, FV, fantasy violence, BN, brief nudity, N, nudity, S, sexual content, AS, adult situations, D, and suggestive dialog.

5. The system of claim 1 wherein the display depicts a main blocking menu which allows a user to block or enable

18

viewing of programs globally, or to block or enable viewing of programs by Rating/content codes, Time, Channel, Time Allowance, pay-per-View dollar Allowance and by Grid Selection from an electronic television program schedule grid guide.

6. The system of claim 1 wherein the display depicts a menu including lists of users entered in a user A database, and a combination of highlighted individual titles or group of titles of the matrix varying according to user.

7. The system of claim 1 wherein the overall program ratings are listed along a column of the matrix, each program rating having rows corresponding to one or more specific program content indications.

8. The system of claim 7 wherein a title corresponding to one of the overall program ratings is activated or deactivated to block or enable a particular program rating.

9. The system of claim 7 wherein a title corresponding to one of specific program content indications is activated or deactivated to block or enable a particular program content indication.

10. The system of claim 1 wherein the means for blocking or allowing viewing comprises a circuitry connected between a television signal input and the display.

11. A method of restricting access to television programs comprising:

inputting cursor movement and selection commands;

displaying a two dimensional matrix composed of rows and columns of tiles, wherein either the rows of tiles or the columns of tiles correspond to overall program ratings and either the rows of tiles or the columns of tiles correspond to specific program content indications and depicts highlighting of individual tiles or groups of tiles based on the cursor movement commands; and

blocking or allowing viewing of television programs based on the overall program ratings and specific content ratings of the rows and columns corresponding the highlighted tiles when a selection command is entered into the input.

12. The method of claim 11 further comprising activating or deactivating a title corresponding to one of the overall program ratings to block or enable a particular program rating.

13. The method of claim 11 further comprising activating or deactivating a title corresponding to one of specific program content indications to block or enable a particular program content indication.

\* \* \* \* \*